804 P.2d 1053

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Dennis A. YBARRA, Defendant–Appellant.**

No. 18506.

Supreme Court of New Mexico.

Nov. 28, 1990.

Jacquelyn Robins, Chief Public Defender, Jerry Todd Wertheim, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Hal Stratton, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WILSON, Justice.

Defendant-appellant Dennis A. Ybarra appeals his conviction of first degree murder. We reverse.

On June 22, 1988, Ybarra and his girlfriend's brother, Ricky Garcia, quarreled outside of Ybarra's apartment. Garcia knocked Ybarra down by striking him in the face twice and then kicked him in the chest while Ybarra lay on the ground. A witness later testified that, as Garcia left the apartment, Ybarra threatened to get even with Garcia. Ybarra then went to the local police department with his brother to file a complaint against Garcia. When Ybarra was told that a complaint could not be filed until morning because a judge was not available, Ybarra became angry and said that the police would find Garcia in pieces. Consequently, the police agreed to escort Ybarra back to the apartment to collect his belongings. However, Ybarra left two or three minutes ahead of the police and arrived at the apartment to find that Garcia had returned as well. Ybarra got out of the truck and moved towards Garcia, waving a knife as he approached. Garcia retreated and kicked Ybarra in the knee. Ybarra then stabbed Garcia.

Garcia was taken to the local hospital where he underwent surgery to repair the stabbing damage to his abdominal organs. Complications to the stab wounds devel-

oped, and Garcia was transferred to another hospital where he died on the operating table several days after the incident.

After the stabbing, the police took Ybarra to the police station. Although Ybarra was placed under arrest, he was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The police then transported Ybarra to the hospital for treatment to his knee which had been injured in the incident.

Ybarra arrived at the emergency room in handcuffs with two police officers assisting him. There he was treated by Nurse Price. Officer Wright remained with Nurse Price and Ybarra during the medical treatment and while Nurse Price asked Ybarra several questions. Nurse Price first asked Ybarra how he hurt his knee. He said that Garcia had kicked him. She then asked, "Are you the one that stabbed him?" Ybarra replied, "Yes." Nurse Price told Ybarra that Garcia was not doing well, to which Ybarra responded that Garcia deserved it and that if he'd had a gun he would have shot him. Nurse Price asked Ybarra what kind of knife he used to stab Garcia. Ybarra responded with a description. She also asked why he had stabbed Garcia, and Ybarra said that he had done it because of the earlier beating and because Garcia had kicked him in the knee during the stabbing encounter. Finally, Officer Wright who had been present in the room with Nurse Price and Ybarra during the questioning asked Ybarra if he knew where the knife was. Ybarra replied that he did not know what happened to it.

At trial Ybarra objected to the introduction of his statements to Nurse Price and requested the court to suppress the testimony concerning such statements as being the result of an impermissible custodial interrogation. The state's response was that there was no interrogation. The state argued that since the police did not instigate or participate in the conversation between Nurse Price and Ybarra, and since Nurse Price was not an agent for the police, it was not a custodial interrogation.

Thus, the state contended, a *Miranda* warning was not required.

After hearing testimony and argument of counsel, and after researching the issue itself, the trial court found: (1) There was an interrogation, and Ybarra was in police custody at the hospital; (2) There was not a coordinated plan between the police and Nurse Price to elicit information from Ybarra for his prosecution; (3) The police had a duty to inform Ybarra of his *Miranda* rights; (4) Nurse Price's conversation with Ybarra began in order to aid in the diagnosis and treatment of his injury, and therefore any statements by Ybarra regarding his injuries would be admissible; (5) Ybarra's nonresponsive or volunteered statements also would be admissible; (6) Nurse Price was faced with the compelling emergency of Garcia's treatment which caused her to ask questions about the kind of knife used in the stabbing, and therefore, under the rescue doctrine, Ybarra's statements regarding this matter would be admissible; and (7) Officer Wright's question in the hospital and Ybarra's response would be suppressed.

On appeal Ybarra maintains his claim that the trial court erred in admitting the testimony regarding his statements to Nurse Price. Ybarra asserts that these statements were the result of a custodial interrogation in violation of the *Miranda* warning rule. The state admits that the conversation between Nurse Price and Ybarra was inadmissible under the rescue doctrine and concedes: "There is not a proper factual predicate to reach the issue of the rescue doctrine." *See People v. Riddle*, 83 Cal.App.3d 563, 576, 148 Cal. Rptr. 170, 177 (1978) (failure to give *Miranda* warning excused when there exists: (1) an urgent need and no other course of action promises relief; (2) the possibility of saving human life by rescuing a person in danger; and (3) rescue as the primary purpose and motive of the interrogator), *cert. denied*, 440 U.S. 937, 99 S.Ct. 1283, 59 L.Ed.2d 496 (1979). On appeal the state resurrects its original argument, namely, that the trial court erred in finding an interrogation. The state contends, however, that the court's decision allowing the

testimony should be sustained under the "right for any reason" doctrine. *See State v. Hensel,* 106 N.M. 8, 738 P.2d 126 (Ct. App.) (trial court will be affirmed on appeal if right for any reason), *cert. denied,* 105 N.M. 720, 737 P.2d 79, *cert. denied,* 484 U.S. 958, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987).

 We affirm the trial court's finding of interrogation, but reverse the court's ruling that the rescue doctrine permitted the admission of Ybarra's statements to Nurse Price regarding Garcia. As we find this issue of custodial interrogation dispositive, we do not reach the other points of error raised by Ybarra on appeal.

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) the United States Supreme Court held that the fifth amendment of the Federal Constitution prohibits the use of "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." This *Miranda* protection "come[s] into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *State v. Edwards,* 97 N.M. 141, 143–44, 637 P.2d 572, 574–75 (Ct.App.), *cert. denied,* 97 N.M. 621, 642 P.2d 607 (1981). An interrogation, therefore, is the threshold requirement when a defendant alleges a violation of his *Miranda* rights. *Id.* 97 N.M. at 144, 637 P.2d at 575.

The United States Supreme Court first addressed the meaning of "interrogation" in the case of *Rhode Island v. Innis.* The Court stated:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

*Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980).

Returning to the issue again in *Arizona v. Mauro,* 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), the United States Supreme Court questioned whether the police actions in question "rose to the level of interrogation—that is, in the language of *Innis,* whether they were the 'functional equivalent' of police interrogation." *Id.* at 527, 107 S.Ct. at 1935. In *Mauro* the defendant was allowed to speak with his wife in the presence of a police officer who recorded the defendant's conversation. The Court held that under both *Miranda* and *Innis* the defendant was not interrogated because there was no evidence that the police instigated or participated in the defendant's discussion with his wife, that the police used the defendant's wife for the purpose of eliciting incriminating statements, or that the defendant felt that he was being coerced to incriminate himself in any way. *Id.* at 527–28, 107 S.Ct. at 1935–1936. Additionally, the Court noted that the police officers had attempted to dissuade the defendant's wife from speaking with her husband and that the defendant had been given advance warning that he would be allowed to speak to his wife only with a police officer present. *Id.* at 528, 522, 107 S.Ct. at 1936, 1933.

Other courts also have grappled with the definition of "interrogation." In *United States v. Webb,* 755 F.2d 382 (1985), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 894, 93 L.Ed.2d 846 (1987) a jail officer asked the defendant a preliminary question in order to determine where in the jail population to place the defendant. The defendant responded with a confession. Relying on *Innis,* the United States Court of Appeals for

the Fifth Circuit held that the jail officer's question was not a question normally attendant to custody and therefore it fell within the *Innis* definition of "interrogation." Ruling the defendant's statements inadmissible, the court concluded that even if no express questioning was involved, "the entire episode ... was reasonably likely to elicit an incriminating response, and [the jail officer] should have known that such a response was reasonably likely." *Id.* at 389. In *People v. Hawkins,* 53 Ill.2d 181, 290 N.E.2d 231 (1972) the court held that no interrogation existed when the defendant confessed to his father in the presence of the police because the latter neither induced the defendant's statement nor used the father to interrogate the defendant. The New York Court of Appeals reached a different result in the case of *People v. Jones,* 47 N.Y.2d 528, 393 N.E.2d 443, 419 N.Y.S.2d 447 (1979). In *Jones* the court found interrogation even though the police did not actively participate in obtaining the defendant's confession. The court stated:

The government, of course, cannot avoid constitutional restrictions by using a private individual as its agent, nor can it claim that only a private act is involved when government officers, subject to constitutional limitations, have participated in the act. Under such circumstances the constitutional restrictions on governmental activity cannot be said to be inapplicable.

. . . .

In order to properly assess the significance of the police participation in this case it must be borne in mind that the purpose of the *Miranda* rule—the requirement that the defendant be advised of his rights before being questioned—is "to dispel the compulsion inherent in custodial surroundings." It is, of course, intended to regulate police conduct and here the People note that ... the police did not take an active part in obtaining the confession.... But the police were not merely anonymous observers. They actively participated in the arrest, one of them clearly identified himself to the defendant and both of them escorted the defendant to the place where he was

interrogated while they awaited the outcome of the questioning.... [T]he participation by the police was sufficient to create the type of custodial atmosphere which the *Miranda* rule was intended to alleviate.

*Id.* at 533–34, 393 N.E.2d at 445–46, 419 N.Y.S.2d at 450 (citations omitted). The New Mexico Court of Appeals interpreted "interrogation" in the case of *State v. Gurule,* 91 N.M. 332, 573 P.2d 687 (Ct.App. 1977), *cert. denied,* 91 N.M. 491, 576 P.2d 297 (1978) wherein the court held that the defendant's statements were not made as the result of interrogation by the police. Rather, the court determined that the statements to the police and the ambulance driver were unsolicited remarks and that the defendant's statements to the physician and to a person to whom the defendant was talking by telephone were merely overheard by the police.

The *Gurule* case is distinguishable on its facts from the case before us. In the present case, Ybarra was being questioned by Nurse Price while under the close, direct scrutiny of a police officer. Although the evidence supports the trial court's finding that no collusion existed between Nurse Price and the police, the same evidence supports the court's finding that Officer Wright, rather than warning Ybarra of his right to remain silent, sat quietly listening, rather enjoying the conversation taking place. As in *People v. Jones,* the police placed Ybarra under arrest and escorted him to the hospital emergency room where he was interrogated by Nurse Price while Officer Wright awaited the outcome of the questioning. Moreover, at the end of the exchange between Nurse Price and Ybarra, Officer Wright actively participated in the conversation with Ybarra by asking an improper question himself. Under these circumstances, there was custodial interrogation.

On appeal, a trial court's denial of a motion to suppress will not be disturbed if supported by substantial evidence, unless it also appears that the determination of the court was erroneously premised. The appropriate standard for re-

view on appeal is whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party; all reasonable inferences in support of the court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded.

*State v. Boeglin,* 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983) (citations omitted). *See also Arizona v. Mauro,* 481 U.S. 520, 528 n. 6, 107 S.Ct. 1931, 1936 n. 6, 95 L.Ed.2d 458 (1987) ("Our decision today does not overturn any of the factual findings of the Arizona Supreme Court. Rather, it rests on a determination that the facts of this case do not present a sufficient likelihood of incrimination to satisfy the legal standard articulated in *Miranda v. Arizona* and in *Rhode Island v. Innis.*").

While we are mindful that not all statements "obtained by the police after a person has been taken into custody are to be considered the product of interrogation," *Innis,* 446 U.S. at 299, 100 S.Ct. at 1689, based on the trial court's findings in this case, we conclude that the compulsion present in the emergency room atmosphere rose above that inherent in custody itself. Although the police did not create that compulsion, they took advantage of it by subjecting Ybarra to circumstances which they knew or should have known were reasonably likely to elicit incriminating responses. Therefore, with the standard of review enunciated above in mind, we affirm the trial court's ruling of interrogation as to the statements between Nurse Price and Ybarra regarding Garcia. We hold, however, that the court misapplied the law; the rescue doctrine is inapplicable, and the statements at issue should have been suppressed.

■ Finally, the state argues that if the trial court erred, it was harmless. We must disagree. Clearly, the erroneous admission of Ybarra's statements to Nurse Price reflecting Ybarra's deliberate intention could not be harmless in a first degree murder trial. The state conceded as much during the motion hearing on this issue.

The state admitted that, other than Nurse Price's testimony, it did not have the evidence available to try Ybarra for first degree murder. This is not a case where the total evidence was so overwhelming that the statements in question contributed nothing towards the conviction. *Cf. State v. Finnell,* 101 N.M. 732, 688 P.2d 769 (court found error in admission of defendant's statement harmless beyond a reasonable doubt in view of other evidence of defendant's guilt), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). We find the trial court's error was not harmless, and Ybarra's conviction is reversed on this issue.

This case is remanded to the trial court to proceed in a manner consistent with this opinion. Upon remand we further instruct the trial court to review the videotape of Ybarra's interrogation in order to determine whether his statements to the police were voluntary.

IT IS SO ORDERED.

SOSA, C.J., and RANSOM and MONTGOMERY, JJ., concur.

BACA, J., dissents.

BACA, Justice (dissenting).

I would affirm the district court and admit the testimony regarding Ybarra's statements to Nurse Price. I believe the statements neither resulted from police interrogation nor its functional equivalent, and accordingly, Ybarra's statements were not elicited in violation of *Miranda.* "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). The purpose of the *Miranda* warnings is to "prevent[ ] governmental officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458 (1987). The police did not exercise their potentially coercive power to obtain a confession, and I

do not believe that constitutional protections would be perverted by the district court's admission of Ybarra's statements.

*Miranda* warnings are required when the person in custody is subjected to an interrogation. Interrogation is defined as "questioning *initiated by law enforcement officers* after the person has been taken into custody." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (emphasis added). This meaning has been expanded to "refer[ ] not only to express questioning, but also to any words or actions *on the part of the police* ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 303, 100 S.Ct. 1682, 1691, 64 L.Ed.2d 297 (1987) (emphasis added). *Accord State v. Edwards*, 97 N.M. 141, 143–44, 637 P.2d 572, 574–75 (Ct.App.), *cert. denied*, 97 N.M. 621, 642 P.2d 607 (1981) (custodial interrogation occurs when the person in custody is exposed to either express questioning or its functional equivalent).

In the instant case, although uncontroverted that Ybarra was in police custody, the officer did not expressly interrogate Ybarra.[1] A nurse acting as a private individual questioned Ybarra. Protections against self-incrimination do not apply to "confessions elicited by private individuals." *People v. Miller*, 137 A.D.2d 626, 628, 524 N.Y.S.2d 727, 729 (1988). Accordingly, in *Miller* the court admitted statements elicited by the suspect's mother in the presence of the police because the mother was not acting as a police agent. In the instant case, the district court found: "[T]here was no plan between officer Wright or any other Artesia police officer and the nurse to elicit information to assist them in a prosecution." Nurse Price was neither an agent of the police, nor, as discussed below, was she used as a police instrumentality intended to subject Ybarra to an express interrogation.

Because there was no express questioning of Ybarra, the next line of inquiry is whether the circumstances of the exchange between the nurse and Ybarra constituted the functional equivalent of express questioning. In other words, did Officer Wright's actions rise to the level of interrogation. To resolve this question we should consider both the intent of the officers and the existence of compulsion from the perspective of Ybarra. *See Mauro*, 481 U.S. at 520, 107 S.Ct. at 1931.

In *Mauro*, the Court examined the intent of the police and found that although the police were present during the suspect's conversation with his wife at the police station there was no interrogation. In reaching that conclusion, the Court noted that the officers had not acted with the intent to elicit incriminating statements, and they had not participated in or instigated the suspect's conversation with his wife. *Id.* at 528, 107 S.Ct. at 1936. In the instant case, Officer Wright brought Ybarra to the emergency room for treatment and not to elicit incriminating statements. Security concerns required the officer's presence in the treatment room. Until the end of the exchange between the nurse and Ybarra, Officer Wright remained silent. Nothing suggests that Officer Wright encouraged or colluded with the nurse. In other words, Officer Wright did not instigate or participate in the challenged conversation between the nurse and Ybarra. Furthermore, although Officer Wright may have known that the possibility of incrimination may have existed, "officers do not interrogate a suspect by hoping that he will incriminate himself." *Id.* at 529, 107 S.Ct. at 1936. Absent any active police participation, or any plan to compel Ybarra to make such incriminating statements, Officer Wright's conduct, under the first prong of the test, did not constitute express questioning or its functional equivalent.

The next consideration is Ybarra's perception of the official compulsion flowing from the atmosphere in the emergency

---

1. After Ybarra had made his incriminating statement to the nurse, Officer Wright did ask Ybarra one question regarding the whereabouts of the knife. The district court, however, properly excluded that conversation; this analysis applies to the activity leading up to that improper question.

room. The majority found that the coupling of Ybarra's custody with the nurse's questions created an environment that was inherently coercive. I disagree. The officer's presence served a legitimate security function and did not produce official compulsion above the level inherent in the custody itself. Ybarra's being in custody, while itself producing some anxiety, could not turn the nurse's discussion with him into an interrogation. The nurse could not exert official pressure such that her questions would constitute an interrogation. *Cf. Mauro* (no official compulsion was found where the incriminating conversation was recorded at a police station with the police officers present).

The majority objects to the officer's conduct because he took advantage of the situation. However, so long as Officer Wright's conduct complied with constitutional requirements, taking advantage of an investigative lead does not violate *Miranda*. Whether such action was fair in any sense other than its constitutionality is irrelevant to the issue before us.

Accordingly, I would affirm the district court's decision to admit the testimony. The decision, however, should be sustained under the "right for any reason" doctrine. *See State v. Hensel*, 106 N.M. 8, 738 P.2d 126 (Ct.App.) (trial court will be affirmed on appeal if right for any reason), *cert. denied*, 105 N.M. 720, 737 P.2d 79, *cert. denied*, 484 U.S. 958, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987). The "rescue doctrine" does not apply to these facts.