**Certiorari Denied, No. 31,704, June 10, 2009**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-071**

**Filing Date: April 21, 2009**

**Docket No. 27,357**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**ROBERT LACOUTURE,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**Karen L. Parsons, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Ralph E. Trujillo, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Susan Roth, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**KENNEDY, Judge.**

**{1}** In this case, we consider constitutional issues surrounding a police interrogation of a hospital patient. Defendant-Appellant Robert LaCouture (LaCouture) pled no contest to possession of methamphetamine, use or possession of drug paraphernalia, and careless driving. A charge of negligent use of a deadly weapon was dropped. In his plea, LaCouture

1

reserved the right to appeal the denial of his motion to suppress certain inculpatory remarks he made to police as a hospital patient following a traffic accident. He argues that his statements should have been suppressed because he made them involuntarily and was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm the district court and hold that LaCouture's statements were voluntary and that, at the time he made them, he was not in police custody and therefore not entitled to a *Miranda* warning.

## BACKGROUND

**{2}** Late in the evening of April 13, 2005, LaCouture was driving from Roswell to Ruidoso on U.S. 70 when his pickup truck collided with a semi-truck. Severely injured, LaCouture was transported to the Lincoln County Medical Center where he received treatment. LaCouture's injuries included a damaged hip and spine, fractured leg bones (both tibia and fibula), four broken ribs, and a bruised lung. Officer Roberto Diaz conducted an initial investigation at the scene and then traveled to the hospital to speak with LaCouture. Officer Diaz testified that such questioning was standard procedure for the New Mexico State Police.

**{3}** At the hospital, Officer Diaz made contact with LaCouture, questioned him about the accident and the events which preceded it, and made an audio recording of the interview.[1] During the interview, as the audio recording indicates, LaCouture was in pain and often moaned and mumbled. Despite whatever pain or discomfort he experienced, however, LaCouture was responsive to Officer Diaz's questions and gave coherent answers. No evidence in the record indicates that Officer Diaz did anything to restrain LaCouture or to prevent him from terminating the interview. LaCouture, likewise, indicates none.

**{4}** During this approximately seven-minute interview, LaCouture made several inculpatory statements in response to questions. When asked, "Do you carry a weapon," LaCouture replied, "Yes sir." He then proceeded to identify the type of weapon he carried. Moments later, the following exchange took place:

> Q:    Are you under the influence of anything?
>
> A:    No, sir.
>
> Q:    If I were to give you a blood test would it come back positive or negative?

---

[1] Based on a comparison of the transcript contained in LaCouture's brief in chief and the audio recording made by Officer Diaz, we note that one of very few discrepancies concerns LaCouture's responses of "yes sir" and "no sir" to Officer Diaz's questions. Several of these are absent from LaCouture's transcript. We also note that when asked to identify his friend, LaCouture's statement, "That's my boy, man," is absent from the transcript. In this opinion, we primarily rely on the transcript, using Officer Diaz's recording when appropriate.

2

A: Probably come back positive, man.

Q: For what?

A: For amphetamine.

Q: When did you take amphetamine?

A: Ah shit, it was earlier today, man.

. . . .

Q: Earlier today? How much did you take?

A: Oh shit, man, it was not much, we smoked a little bit.

Still later, Officer Diaz asked LaCouture if he had taken any other drugs, and LaCouture replied, "This morning I was getting a bad migraine so I took a Loratab." When asked if it was prescribed, LaCouture indicated that it was not.

{5} LaCouture was charged with possession of methamphetamine, use or possession of drug paraphernalia, aggravated DWI, negligent use of a deadly weapon, and reckless driving. He filed a pretrial motion to suppress the statements he made in the hospital, and the matter came before the Lincoln County District Court on January 27, 2006. LaCouture argued that his statements were involuntary and that their admission would violate *Miranda*.

{6} After hearing evidence and the arguments of counsel, the district court denied LaCouture's motion. It found that LaCouture's statement was voluntary because he was "conscious and knew what he was saying[,] . . . was quite coherent[,] and [had] asked and answered questions appropriately." The court concluded that "under the circumstances, I do not believe it was necessary to read *Miranda* [to LaCouture] prior to [Officer Diaz] asking questions about the accident."

{7} After the denial of his motion to suppress, LaCouture entered a plea agreement with the State. In return for the dismissal of his charges for aggravated DWI, negligent use of a deadly weapon, and reckless driving, LaCouture entered a plea of no contest to the charges of possession of methamphetamine, use or possession of drug paraphernalia, and careless driving. As a result, he was sentenced to almost three years of probation.

{8} LaCouture asks this Court to reverse the district court's denial of his motion to suppress. He claims that his inculpatory statements to Officer Diaz should have been suppressed because they were involuntary and because he was not issued a *Miranda* warning prior to making them. We consider each of his arguments in turn.

**DISCUSSION**

3

## 1.    Standard of Review

**{9}**    When reviewing a district court's denial of a motion to suppress, we consider its findings of fact for substantial evidence, *State v. Leyba*, 1997-NMCA-023, ¶ 8, 123 N.M. 159, 935 P.2d 1171, and view them in the light most favorable to the prevailing party. *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856. We then consider the district court's legal conclusions de novo. *Leyba*, 1997-NMCA-023, ¶ 8. In this way, we analyze de novo the questions of whether a defendant's statement was voluntary and whether the defendant was subject to a custodial interrogation. *State v. Cooper*, 1997-NMSC-058, ¶¶ 25-28, 124 N.M. 277, 949 P.2d 660 (providing the standard of review to determine voluntariness);   *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (providing the standard of review to establish custodial interrogation).

## 2.    LaCouture's Claim That His Statements Were Involuntary

**{10}**    LaCouture first asserts that his confession to Officer Diaz was involuntary and should have been suppressed by the district court. In arguing against a motion to suppress, the prosecution must prove that the defendant's statement was voluntary by a preponderance of the evidence. *State v. Fekete*, 120 N.M. 290, 298, 901 P.2d 708, 716 (1995). On appeal, we determine the voluntariness of a statement by analyzing the entire record and the circumstances under which the statement was made. *Id.* The "totality of the circumstances" provides our guiding light in such an analysis. *Id.* (internal quotation marks and citation omitted).

**{11}**    New Mexico defines voluntariness as "freedom from official coercion." *State v. Munoz*, 1998-NMSC-048, ¶ 21, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted). As stated above, we analyze the totality of the circumstances, but an involuntary statement must also have been made in response to some "element of official overreaching" by the police. *Id.* (internal quotation marks and citation omitted). Examples of official overreaching include "intimidation, coercion, deception, assurances, or other police misconduct that constitutes overreaching." *Id.* ¶ 23. Looking at the totality of the circumstances may require considering the physical and mental state of the Defendant as a context affecting what might be coercive and overreaching. What techniques that may be coercive when employed with an injured or medicated subject may not be when dealing with a healthy and unmedicated defendant.

**{12}**    Despite his physical condition, LaCouture was responsive to Officer Diaz's questions and was able to answer them coherently. At the time Officer Diaz interviewed him, LaCouture had suffered an automobile crash that caused him various injuries, including damage to his hip and spine, broken ribs, fractured leg bones (both tibia and fibula), and internal bruising. Despite these injuries, LaCouture was able to respond coherently to all of Officer Diaz's questions, more often than not providing the required information and occasionally stating that he did not remember. For instance, LaCouture was able to state his vehicle's direction of travel, the highway on which he was driving, his destination, and the city from which he departed. He was able to remember and communicate the events of the crash:  first, that he saw a semi-truck, and second, that he tried to steer clear of it "[b]efore

4

the impact." He was able to remember that he carried a gun, that he had taken amphetamines, and that he had taken a Loratab. Interestingly, he refused to give the name of the person from whose house he had departed, stating, "I can't tell you that, man. [That's my boy, man.] I'm sorry." And when asked about where and with whom he had taken amphetamines, LaCouture stated that he smoked them at this same "friend's house" and remained silent about the person's identity. Throughout the interview, LaCouture said "yes, sir" or "no, sir" several times and cooperated fully with Officer Diaz. Finally, near the end of the interview, after Officer Diaz read the Implied Consent Act, LaCouture even asked, "Could you repeat all that stuff?" These aspects of the taped conversation between Officer Diaz and LaCouture provides substantial evidence supporting the district court's findings of fact.

**{13}** We turn now to the behavior of Officer Diaz. For example, at no time during the interview did he threaten LaCouture, promise special treatment in return for LaCouture's cooperation, physically abuse LaCouture, or engage in coercion of any type. Most of his questions were benign, revolving around the facts of the accident. And although LaCouture never explicitly consented to the questioning, when Officer Diaz stated, "I'm here . . . to ask you a couple of questions, OK," LaCouture did not resist. Officer Diaz also repeatedly made sure that LaCouture understood, and on multiple occasions during the interview he asked, "Do you understand?" The entire exchange between LaCouture and Officer Diaz lasted approximately seven minutes.

**{14}** We conclude that LaCouture's mental state, though certainly not that of an uninjured, healthy person, was not so impaired as to transform Officer Diaz's questions into official overreaching. A review of the taped interview therefore demonstrates that LaCouture was responsive and capable of coherently answering Officer Diaz's questions. Our review likewise indicates that Officer Diaz's conduct shows no traces of "official overreaching" due to LaCouture's mental state or Officer Diaz's own actions as that term is defined in this state or in federal jurisprudence. The record thus provides substantial evidence for the district court's findings of fact.

### 3. LaCouture's Claim That He Should Have Received a *Miranda* Warning

**{15}** LaCouture next contends that his confession should have been suppressed because he was subjected to a custodial interrogation without first being issued a *Miranda* warning. In *Miranda*, the United States Supreme Court held that the Fifth Amendment requires the exclusion of certain confessions when the police fail to notify a defendant of his rights. *State v. Ybarra*, 111 N.M. 234, 236, 804 P.2d 1053, 1055 (1990). Such a warning is required only when police subject a defendant to a "custodial interrogation." *State v. Juarez*, 120 N.M. 499, 502, 903 P.2d 241, 244 (Ct. App. 1995). Police meet the "interrogation" requirement whenever they expressly question a defendant or expose him to the functional equivalent of questioning. *Ybarra*, 111 N.M. at 236, 804 P.2d at 1055. Police meet the "custodial" requirement in one of two ways: either the defendant's "freedom of movement [was] restrained to a degree associated with a formal arrest" or the defendant was restrained in such a way that a reasonable person would feel "not free to leave the scene." *Munoz*, 1998-NMSC-048, ¶ 40 (internal quotation marks and citations omitted). The test is an objective

one, and the "subjective beliefs of the defendant and the interviewing officer . . . are irrelevant." *Id.* (internal quotation marks and citation omitted).

**{16}**     Our appellate courts have never considered whether the interrogation of a hospital patient constitutes a custodial interrogation. We therefore look to other state authority that has dealt with the issue. Based on the out-of-state authority the determination that a defendant was subjected to custodial interrogation most often turns on the distinction between circumstantial restraints and direct police-imposed limitations on a defendant's freedom. *See Yarborough v. State*, 178 S.W.3d 895, 901-02 (Tex. App. 2005) (holding that factors incident to medical treatment, not police, restrained the defendant); *Commonwealth v. Perry*, 710 A.2d 1183, 1185-86 (Pa. Super. Ct. 1998) (holding that a defendant who was wearing a neck brace, attached intravenously to tubes, and lying on a hospital gurney was not in custody); *see also State v. Melton*, 476 N.W.2d 842, 845 (Neb. 1991) (holding that a hospital patient was not subjected to custodial interrogation); *Hammond v. State*, 569 A.2d 81, 94 (Del. 1989) (where an emergency room patient was restrained not by police but by his condition); *but cf. Ybarra*, 111 N.M. at 235, 238, 804 P.2d at 1057 (interrogation was custodial where a hospital patient was placed in handcuffs by police prior to questioning); *State v. Pebria*, 938 P.2d 1190, 1192, 1194 (Haw. Ct. App. 1997) (interrogation was custodial where defendant was detained by hospital security guards prior to and during questioning); *State v. O'Loughlin*, 637 A.2d 553, 555, 557 (N.J. Super. Ct. App. Div. 1994) (interrogation was custodial where defendant was detained by police at a hospital).

**{17}**     On the record before us, we find little evidence to support the notion that LaCouture was subjected to a custodial interrogation. His inculpatory statements were made prior to being placed under formal arrest. And though he had experienced serious physical injuries and was apparently in a great deal of pain, LaCouture was never placed in handcuffs, and the record indicates no time at which he and Officer Diaz engaged in physical contact of any kind. Officer Diaz questioned LaCouture in a public place, as indicated by the ambient noise on the interview tape. Finally, Officer Diaz never antagonized LaCouture or applied aggressive tactics to elicit the confession.

**{18}**     Nevertheless, LaCouture asserts that despite the absence of any police-imposed restraint on his freedom, he was still subjected to a custodial interrogation because his injuries confined him to the bed and rendered him unfree to leave, he was surrounded by "antagonistic forces" and "techniques of persuasion," and he asked for a lawyer and was told that he did not need one. These arguments fail to persuade us. First, as outlined in the cases above, the fact that LaCouture was restrained by injuries and medical accoutrements warrants little consideration. LaCouture was exposed only to circumstantial restraints, and, as stated above, the record indicates no action by Officer Diaz to restrain him. Second, Officer Diaz's conduct can hardly be interpreted as "antagonistic." Throughout the interview, Officer Diaz conducted himself in a professional manner, thanked LaCouture repeatedly, and asked him if he understood on several occasions. As to LaCouture's alleged "techniques of persuasion," we remain unclear on exactly what that means. LaCouture provides no examples, and we reject it.

**{19}**     Third, that LaCouture requested and was denied a lawyer does not transform his non-

6

custodial interrogation into a custodial interrogation. After making the inculpatory remarks that form the subject of this appeal, LaCouture asked, "Am I going to need a lawyer?" Officer Diaz answered, "Not yet." LaCouture asserts that this exchange reflects a custodial interrogation. We disagree. A person has a right to an attorney only after being exposed to custodial interrogation, which occurs "as soon as [the person's] freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotation marks and citation omitted). LaCouture misapprehends the interrelationship between *Miranda*, custodial interrogation, and his constitutional right to counsel. His inquiry of Officer Diaz about whether he needed legal representation neither renders his interrogation custodial nor creates a right to legal representation.

**{20}** LaCouture's request for an attorney *after* his arrest constitutes another matter entirely, but it has no operative legal effect on the outcome of this appeal, and we consider it only in the interest of clarity. After making various incriminating remarks to Officer Diaz, LaCouture was placed under arrest. Shortly after being placed under arrest, he invoked his right to counsel, but the record fails to indicate whether the request was honored. Of course, once Officer Diaz placed LaCouture under arrest, a custodial relationship was created. But we note that LaCouture made no inculpatory statements after this event, and his request for an attorney, even if denied, was therefore immaterial.

**{21}** Based on the analysis above, we affirm the district court's denial of LaCouture's motion to suppress his statements to Officer Diaz and hold that he was not subjected to a custodial interrogation. Because he was not subjected to a custodial interrogation at the time his incriminating statements were made, a warning under *Miranda* was unnecessary. His statements were admissible.

## CONCLUSION

**{22}** For the reasons stated above, we hold that LaCouture's admission was voluntary and that he was not subjected to a custodial interrogation. The district court's findings of fact are supported by substantial evidence in the record, and its conclusions of law were accurately applied. We affirm.

**{23} IT IS SO ORDERED.**

---

**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

---

**JAMES J. WECHSLER, Judge**

---

**MICHAEL D. BUSTAMANTE, Judge**

7

**Topic Index for *State v. LaCouture*, No. 27,357**

| **CA** | **CRIMINAL PROCEDURE** |
|---|---|
| CA-MR | Motion to Suppress |
| CA-MW | Miranda Warnings |
| CA-SI | Self-incrimination |

| **CT** | **CONSTITUTIONAL LAW** |
|---|---|
| CT-CF | Confession |
| CT-MW | Miranda Warnings |
| CT-SL | Self-incrimination |