*612 OPINION OF THE COURT
William D. Friedmann, J.
Defendant, charged with possession of a handgun without a permit (criminal possession of a weapon in the third degree), seeks suppression of that gun seized by a private hospital security officer, and certain inculpatory statements made to the security officer and later to the New York City Police.
A so-called Mapp-Huntley hearing (Mapp v Ohio, 367 US 643 [1961]; People v Huntley, 15 NY2d 72 [1965]), conducted on November 13, 1985, places into focus seldom considered but critical questions as to whether the seizure of the gun in the hospital parking lot by the private security officer was subject to Federal-State constitutional scrutiny, and whether the verbal and nonverbal encounter between the defendant (also a hospital security officer), the responding security officer and the New York City police officers, took place in a custodial environment requiring the administration of Miranda safeguards (warnings) (Miranda v Arizona, 384 US 436 [1966]).
RELEVANT FACTS
Fiore Papa, a security officer (this court takes judicial notice that Papa was a retired member of the New York City Police Department) at the Long Island Jewish Hospital, was instructed by his security supervisor, via radio transmission, to proceed to the Schneider’s Children’s Hospital parking lot (also part of the same hospital complex). He was told to locate a certain auto reportedly containing a handgun. He was also informed that the New York City Police Department had been notified and would arrive shortly. When he located the auto, he observed the handgun in a holster on the front seat. He immediately radioed his supervisor who replied, "the police will be on the scene”. The security officer checked the auto door and found it locked. The defendant, Charles Elliot, himself a security officer at Schneider’s Children’s Hospital, arrived on the scene and saw the responding uniformed security officer standing by his auto. Defendant, without prodding, told the security officer that the auto was his. He then opened the auto door and gave the gun to the security officer. Defendant then left the scene. The New York City Police arrived within minutes, and the responding security officer reported his findings and handed the gun to the police. Defendant then returned to the scene. New York City Police Officer Richard Rudakiewich asked defendant if the auto was his; defendant replied affirmatively. Rudakiewich then asked defendant if he *613 had a permit for the gun. Defendant replied he did not. The police officer then placed the defendant under arrest. While in a police car on the way to the police station defendant was read his Miranda warnings. He then told Officer Rudakiewich that he had gotten the gun down south.
CONTENTIONS OF THE PARTIES
The prosecution contends that any action by the hospital security officer is not subject to constitutional scrutiny under either the United States or New York State Constitutions. It is further contended that even if the action of the security officer was subject to constitutional scrutiny, that the result should still be a denial of suppression of the gun and statements made to the private security officer and to the New York City Police (both before and after Miranda warnings).
Defendant, in support of his suppression application, contends that the seizure of the gun by the hospital security officer, and the pre-Miranda statements made by him to the security officer, and to the New York City Police were made while he was under custodial restraint. That the post -Miranda statement to the city police was improperly obtained, as it was not proceeded by probable cause to arrest.
ARE THE ACTIONS OF THE PRIVATE SECURITY OFFICER SUBJECT TO CONSTITUTIONAL RESTRAINTS?
In order to determine the propriety of the seizure of the gun by the hospital security officer and the reception of the statements made in connection therewith (in the hospital parking lot), this court must initially address whether the hospital security officer was acting in a private capacity or as an operative of the Police Department. This preliminary inquiry is necessary as generally statements made to private individuals, or an unauthorized search or seizure by such persons, does not render that evidence inadmissible at a subsequent law enforcement proceeding (People v Rhodes, 107 AD2d 769 [1985]).
MODERN DEVELOPMENT OF PRIVATE SECURITY
The modern development of private security challenges some of our most fundamental legal and constitutional concepts. Such concern is illustrated by the increasing number of businesses, governmental agencies, neighborhoods and individ *614 uals that are giving private security entities a new role that spills over into public law enforcement areas.
In a recent New York Times article, Private Guards Get New Role in Public Law Enforcement (Nov. 29, 1985, at 1, col 4), we are acquainted with the fact that in the United States approximately 1.1 million private security guards are not only performing traditional security functions, i.e., the protection of property, but also assuming traditional police functions for private entities as well as for Federal, State and local, governmental authorities around the country.
According to the National Institute of Justice, the number of security guards has increased by 50% over the last 10 years, and there are indications projecting an even further expansion, for example, there exists grave concern about the ability of many police departments to competently investigate the technical complexities of corporate crime, computer crime, as well as commercial bribery and/or industrial espionage, etc.
In summary, officials of the private security industry say their services save money and get around "red tape”. However, critics of this rapid extension of private security into both the private and public sectors point to less strict training programs for those in private security, as compared to those for official police officers, the general nonexistence of regulation of the private security industry, and the fact that private security officers and personnel are not subject to the same constitutional scrutiny and control as public officers.
The popular press, as well as legal periodicals, are now discussing the problems posed by the fear of crime, the proliferation of private forms of security measure to protect against crime, and the fact that society has a legitimate interest in being safeguarded from potential abuses posed by private protectors or enforcers. In spite of this growing interest, very few courts to date have addressed the question whether private security personnel must give Miranda warnings to suspects whom they are questioning, and/or must they observe other constitutional restraints with respect to identification, search and seizure, etc. (Safe Customers Now Duty of Security Guards, Los Angeles Daily Journal, Dec. 4, 1984, at 1, col 3; No Warning Needed From Guards, Los Angeles Daily Journal, Nov. 6, 1981, at 1, col 1; Reality and Illusion: Defining Private Security Law in Ohio, 13 Toledo L Rev 377 [Winter 1982]; The Miranda Policies and Requirements as They Relate *615 to Department Store Detectives, 9 [No. 4] Pepperdine L Rev 1015 [1982]; Stenning and Shearing, The Quiet Revolution: The Nature, Development and General Legal Implications of Private Security in Canada, 22 Crim LQ 220 [Mar. 1980]; People v Zelinski: State Action and Constraints on Store Detectives, 3 Crim Just J 489 [Spring 1980].)
MIRANDA SAFEGUARDS
No decision more rightly deserves the label "Landmark” than Miranda v Arizona (384 US 436, supra). Its name echoes daily in almost every criminal courtroom across the United States. It has, without question, drastically impacted law enforcement for the past 20 years. In summary, it was intended to place realistic teeth into the US Constitution 5th Amendment privilege against compulsory self-incrimination.
Miranda’s main thrust was directed at the use by law enforcement agencies of statements, whether exculpatory or inculpatory, which stem from the custodial interrogation of a defendant, unless there be a demonstration that effective procedural safeguards were used to secure a defendant’s privilege against self-incrimination.
APPLICATION OF MIRANDA TO PRIVATE LAW ENFORCEMENT PERSONNEL
The 5th Amendment privilege against compulsory self-incrimination, which the Miranda safeguards were designed to protect, has been very cautiously applied to situations not involving interrogation by official law enforcement personnel.
The majority of State courts, which have considered the application of Miranda to private security personnel, have held that Miranda only applies to official law enforcement agents, and does not apply to interrogations by private security personnel (see, e.g., People v Bolan, 27 Ohio St 2d 15, 271 NE2d 839 [1971]). In the view of this court, this position grants to these privately employed, and often ill-trained individuals, great and undoubtedly unsupervised powers (People v Frank, 52 Misc 2d 266, 267 [Sup Ct 1966]; State v Lombardo, 104 Ariz 598, 457 P2d 275 [1969]; People v Amata, 270 Cal App 2d 575, 75 Cal Rptr 860 [Ct App 1969]; People v Omell, 15 Mich App 154, 166 NW2d 279 [1968]; State v Kelly, 61 NJ 283, 294 A2d 41 [1972]).
Recently, however, a few courts have acknowledged the real *616 impact upon the public interest of private security employees, and the potential dangers which can result from their rising importance in crime prevention and detection (see, People v Zelinski, 24 Cal 3d 357, 594 P2d 1000 [1979], revd by People v Geary, 173 Cal App 3d 904, 219 Cal Rptr 557; Los Angeles Daily Journal, Oct. 31, 1985, at 19, col 1; United States v Lima, 47 USLW 2696 [DC Super Ct 1979] [holding store security guard subject to 4th Amendment exclusionary rule because of its deterrent effect on guard abuses of authority and because store guards perform a public function], revd 424 A2d 113 [DC App 1980]; but see, 424 A2d, at p 121 [dissenting opn]; State v Brecht, 157 Mont 264, 270, 485 P2d 47, 51-52 [1971] [4th Amendment protects a person’s right to privacy and is violated whether the intrusion is governmental or private]).
As a result of these early warning decisions, there are already predictions within the private security industry that similar rulings will be adopted in other jurisdictions. Some members of the security industry have even recommended that private security employees act as if these rules were already in effect in their jurisdiction, to assure that the evidence they obtain is admissible in court. (Bilek, Klotter & R.K., Federal Legal Aspects of Private Security, at 112-121 [1981]; Fuller, Private Security in the Courtroom: The Exclusionary Rule Applies, Mar. 1980 Security Mgmt, at 38-41.)
This court finds itself in sympathy with those courts which have expressed concern. It has previously held private security guards subject to constitutional scrutiny. Such has been decision of this court in a case where the issue was private line-up identification (People v Martines, NYLJ, July 6, 1984, p 15, col 1). These few concerned courts have fashioned a realistic "public function or acting in the public interest test” which maintains that where organized and structured private security entities or agents assert the power of the State to investigate or make an arrest, or detain persons for subsequent transfer of custody to the State, or subsequent State law enforcement and the State has acquiesced or allowed such use of public power, such private organized action, in contemplation of State involvement, is sufficient to enable a court to apply constitutional restraints as called for by Miranda, etc. No extended coverage would affect truly private actions of private individuals acting in private capacities.
The New York Court of Appeals has, on several recent *617 occasions, outlined its views concerning the sufficiency of State-private involvement necessary to triggering the observance of Miranda safeguards. That court has set down what may be termed a public accommodation test which must be applied here.
In People v Ray (65 NY2d 282, 286), the status of the law in New York was succinctly digested: "The avowed purpose of Miranda was to secure the privilege against self-incrimination from encroachment by governmental action. (Miranda v Arizona, 384 US 436, 445.) In the absence of active governmental participation in a private investigation, no Miranda warnings need be administered. Private conduct, however, may become so pervaded by governmental involvement that it loses its character as such and invokes the full panoply of constitutional protections. (People v Jones, 47 NY2d 528; People v Esposito, 37 NY2d 156, 160; People v Adler, 50 NY2d 730, 737; Corngold v United States, 367 F2d 1.) Relevant indicia of State involvement, which may transform private conduct into State action, include: a clear connection between the police and the private investigation (People v Horman, 22 NY2d 378, 380); completion of the private act at the instigation of the police (People v Esposito, supra); close supervision of the private conduct by the police (People v Esposito, supra); and a private act undertaken on behalf of the police to further a police objective (People v Adler, supra). ”
Here, there was, in the opinion of this court, coordinated private-public law enforcement involving the investigation of a crime incident. The parking lot investigation and response here, by the hospital security officer, did accommodate police objectives. It should be contrasted with the traditional role of protecting hospital property or keeping order within the hospital, etc. A gun was sighted in an auto in the hospital parking lot. The hospital security department was notified and it, in turn, notified the city police. The security supervisor radioed a security officer to investigate the scene. The investigating officer was told that the New York City Police had already been notified and would arrive shortly. Upon finding the gun in the auto, the security officer was informed again by his supervisor that "the police will be on the scene”. Further investigation by the security officer revealed that the auto door was locked. The defendant arrived around that time, and the security officer asked defendant if the auto was his. Defendant replied that it was. Defendant then voluntarily unlocked the auto and handed the security officer the gun. *618 Moments later the police arrived and the security officer turned over the gun.
APPLICATION OF MIRANDA TESTS TO THE PARKING LOT CONFRONTATION
Having found that this encounter constitutes coordinated law enforcement, which accommodated and furthered police objectives, it becomes necessary to apply Miranda standards to this parking lot confrontation.
The following inquiries must be made: Was the parking lot setting that kind of custodial environment proscribed by Miranda? Was the security officer’s single question about the auto’s ownership, and defendant’s verbal and nonverbal response thereto, exempted from the necessity of Miranda safeguards? Were the limited on-the-scene questions by the New York City Police as to auto ownership and gun permit exempted from Miranda? Was the post -Miranda question and response contaminated?
Before such exploration, it would be useful to recall that Miranda was clearly directed at custodial interrogation, that is, on a case-by-case analysis, where one is in custody, where he is deprived of his freedom of action in any significant way (384 US, at p 444). Miranda was not meant to preclude police from carrying out their traditional investigatory function of investigating crime, including general on-the-scene questioning as to the facts surrounding a crime (384 US, at pp 477, 481), and Miranda did not in any way bar volunteered statements of any kind (supra, p 478).
The sole question asked by the hospital security officer regarding the auto’s ownership was made openly in an on-the-scene setting, i.e., a hospital parking lot open to the public. Such type of confrontation does not approach the custodial environment or atmosphere envisioned by Miranda (see, 2 Ringel, Searches & Seizures, Arrest and Confessions § 27.3 [a], and cases cited therein).
Further, the limited routine questions, although having the potential of producing an incriminating statement from a suspect, does not appear to be "interrogation” as that term was addressed in Miranda (see, id., § 27.4, and cases cited therein).
Defendant’s affirmative response concerning the auto’s ownership and his opening of the car and his turning the gun over *619 to the security officer, for whatever assigned reason, whether defendant was naive or trying to curry favor or understanding, etc., appears to have been voluntarily made and thereby exempted from Miranda requirements (see, Ringel, op. cit. §27.4 [a], [b]).
In concluding (1) that the parking lot setting was not of a custodial character, and (2) that the security officer’s inquiry was of a routine investigatory nature, and (3) that defendant’s response was voluntarily made, this court notes that the defendant himself was a security guard at the same hospital. He should have been aware of the lack of custodial restraint concerning the confrontation in the parking lot, as he was allowed to leave the parking lot scene prior to the arrival of the city police. For the purpose of determining when Miranda safeguards are required, i.e., when a custodial setting is in effect, which deprives freedom of action in any significant way (384 US 436, 444, supra), it is not a suspect’s objective belief that is determinative, but rather that of the proverbial reasonable man, innocent of any crime; what he would have thought had he been in the suspect’s shoes (People v Davis, 109 AD2d 846 [1985]). In applying this test, this court concludes that defendant’s contention of being under custodial restraint was not substantiated by the facts, nor by what a reasonable man, innocent of any crime, would have thought.
PRE-MIRANDA STATEMENTS TO POLICE
With respect to defendant’s parking lot statements to the New York City Police, this court, for the reasons stated above, with respect to statements made to the private security officer, also finds that these limited and routine inquiries and responses thereto are exempt from the necessity of Miranda safeguards.
When the New York City Police arrived on the scene, they were handed the gun by the security officer. The New York City police officer asked the defendant the following questions: Was the auto his? Was this his handgun? Did he have a permit for the gun? This questioning represents routine investigative inquiries necessary in ascertaining facts. According to this court, these inquiries are specifically exempted from Miranda requirements. Miranda excludes "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process” (384 US, at p 477). Defendant’s responsive on-the-scene statements *620 were the product of a routine on-the-scene fact-finding inquiry. Until defendant’s responses were made, he was not in custody and any of his statements were voluntarily made. The court notes that when the officer received affirmative replies to his routine inquiries, he arrested the defendant, placed him in the police car and read him his Miranda safeguards.
Defendant’s statement, after receiving his Miranda warnings, about having gotten the gun down south, does not seem improper or contaminated in any way as it was proceeded by probable cause to arrest.
SEIZURE OF GUN BY PRIVATE SECURITY OFFICER
Having determined that the hospital security officer was involved in a coordinated law enforcement objective with the New York City Police, and therefore his behavior must stand the muster of constitutional scrutiny, we now must examine the defendant’s turning over of the gun to him.
Based upon the Miranda discussion (supra), concerning voluntarily made statements, etc., this court concludes that the seizure of the gun from the auto in the parking lot after the. car was opened by defendant, was made with defendant’s full consent. That the consent to the search and seizure by the security officer was given fully and voluntarily in all respects (People v Gonzales, 39 NY2d 122, 128 [1976]; see also, People v Carter, 30 NY2d 279 [1972]; People v Kuhn, 33 NY2d 203 [1973]; cf. People v Cosme, 48 NY2d 286 [1979]), and the seizure by the security officer was made incidental to defendant’s lawful arrest by the police.
CONCLUSIONS
Under circumstances evidencing a simple and brief but coordinated police-private investigation venture, involving hospital security officers and the New York City Police Department, this court concludes that the action by the hospital security officer should be subject to Federal-State constitutional scrutiny.
Even though this action is found subject to constitutional scrutiny, it is determined by a showing of clear and convincing evidence, that the seizure of the gun by the hospital security officer was not improper, but rested upon defendant’s consent freely and voluntarily made, and was incidental to a lawful arrest made shortly after seizure by the New York City Police. It is further determined, beyond a reasonable doubt, *621 that the limited on-the-scene investigatory questions (one by the security officer and three by the New York City Police) and defendant’s responses thereto, were voluntarily made within the meaning of CPL 60.45 and were not made in a custodial setting or under other circumstances requiring the administration of Miranda warnings. Further, that the post-Miranda question and response was properly made and was proceeded by probable cause to arrest.
Accordingly, the motions to suppress physical evidence and statement are hereby denied.