2008-NMCA-041

182 P.3d 137

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Luis SANTIAGO, Defendant–Appellee.**

**No. 26,859.**

Court of Appeals of New Mexico.

Jan. 31, 2008.

Certiorari Granted, No. 30,953,
March 19, 2008.

Gary K. King, Attorney General, Santa Fe, NM, James W. Grayson, Assistant Attorney General, Albuquerque, NM, for Appellant.

John Bigelow, Chief Public Defender, J.K. Theodosia Johnson, Assistant Appellate Defender, Santa Fe, NM, for Appellee.

## OPINION

VIGIL, Judge.

{1} The State appeals the district court's order granting Defendant's motion to suppress. Defendant was searched outside of a shopping mall by private mall security guards after he was maced, thrown to the ground, and handcuffed, because he had a verbal confrontation with a peer within the mall. As a result of the search, the mall security guards discovered a pill bottle in Defendant's pants pocket containing cocaine. The district court concluded that the search and seizure conducted by the mall security guards is governed by the Fourth Amendment. Further, the district court concluded the search and seizure to be unreasonable under Fourth Amendment standards, and it ordered that the physical evidence be suppressed, as well as all other evidence discovered as a result of the search and seizure under the fruit of the poisonous tree doctrine. We affirm.

## FACTS AND PROCEDURAL HISTORY

{2} Defendant testified he was at the Coronado mall when his girlfriend's ex-boyfriend came up behind him, and grabbed his visor. They cussed and yelled at each other, but there was no actual fight. Defendant grabbed his visor back and started walking up the escalator at a fast pace to leave the mall. Half-way up the escalator, Defendant heard a mall security guard yell, "Hey." Since his car was right outside, and he was already leaving the mall, he started a "light jog" towards his car. Two mall security guards were waiting for Defendant outside, and they told him to get on the ground. When he heard them tell him to get on the ground, Defendant held his arms straight out, asking them why, and testified, "I never took an aggressive step or anything toward them." However, the mall security guards threw him down face-first onto the pavement, cutting his chin. Defendant testified, "I was facing down. I was facing down on my stomach. I was on my stomach. My head was turned to the left, and my hands were behind me, and there was one [mall] security guard-one [mall] security guard was holding my hands; the other [mall] security guard had his knee in my neck.... And the other one

was searching me." Defendant further testified that while he was being searched, "I was yelling at him to stop because, I mean, I thought it wasn't legal to search anybody, you know, without any consent, you know. So he started searching me. I was yelling at him he couldn't search me. He was telling me to shut up, and he took everything out of my pockets." When he was asked if this was a pat-down search, Defendant replied, "I didn't feel no patting down. I felt his hands go straight into my pockets." Defendant then heard the mall security guard say, "Look what we have here. Call APD [Albuquerque Police Department]."

{3} Security Guard Ryan Martin testified he works for Valor Security, which provides security for the Coronado Mall. The mall security guards wear a uniform, "which kind of looks like Albuquerque Police Department's uniform with the exception of the badge and the Smokey Bear hats[.]" Security Guard Martin was in the parking lot in one of the marked mobile patrol vehicles used by the security guards when he heard a radio dispatch, and he went to the south patio main entrance area of the mall. He saw Defendant running out of the entrance and Security Guard Richard Timmons following him while giving Defendant verbal commands to stop and get down to the ground. Defendant stopped and turned around toward Security Guard Timmons. Security Guard Martin interpreted his action as taking "an aggressive stance towards him." Security Guard Martin also commanded Defendant to get to the ground, but he did not comply, and Security Guard Timmons sprayed mace towards Defendant's face. Defendant then turned back towards Security Guard Martin to run from the mace and Security Guard Martin grabbed his right arm to take Defendant to the ground. As they struggled, Security Guard Martin sprayed mace into Defendant's face. At this time Valor Security Sergeant George Rodriguez showed up on the scene and put hand restraints on Defendant. When asked whether Defendant was arrested Security Guard Martin answered, "We are to advise anybody that we place in hand restraints that they are under citizen's arrest and we did so." In his

report Security Guard Martin noted that Defendant was told he was under citizen's arrest "for breach of the peace." When asked what his understanding of a citizen's arrest is, Security Guard Martin answered, "It's a citizen detaining an individual, private citizen detaining an individual for a crime until APD arrives." The Valor Security mall dispatcher is just inside the glass doors where the struggle took place and Security Guard Martin said the Valor dispatcher "called via our radio to the Albuquerque Police Substation and contacted Officer Newbill on the radio and advised that we needed back up[.]" The Valor security guards use two-way walkie-talkie radios at the mall, and the APD has one of these radios in its substation. After the incident outside the mall door, Security Guard Martin followed the police officers to the APD substation to exchange information with the APD officers to complete his report.

{4} The Coronado Mall furnishes the APD with a police substation. Officer Keith Newbill of the APD testified that he had been working with mall security for about two years and that "I am the Coronado Mall officer." He was working at Coronado Mall and overheard on the Coronado Mall security radio he had that there was a fight on the lower level of the mall. He was then asked to assist, "because the fight had moved out to the south patio and they were struggling with an individual." When he first arrived at the scene, he took Defendant to his police car, set Defendant inside of it, and then went back to find out what was happening. When he placed Defendant in his police car, Defendant was not free to leave, "because I needed to identify him and determine whether or not I was—mall security was going to want a criminal trespass notification." This coincided with Officer Newbill's understanding of an arrest. "[M]ost generally what happens in these type of scenarios is they're issued criminal trespass notifications saying they can't return, and I send them on their way. It requires a short little report, and it's a quick process." However, in this case, Detective Bruce Arbogast of the APD came to the car holding a pill bottle he indicated he had picked up along with other property that belonged to Defendant, opened it up, and said, "Look at this." Officer Newbill looked inside and saw five little baggies with white powder, so they decided to go the APD substation and field test the substance.

{5} Detective Arbogast testified he was at the Coronado Mall when Officer Newbill received a radio call from Coronado security requesting the APD to respond to a fight. Each driving their own police unit, he and Officer Newbill, "drove over there as fast as we could to help assist in the fight and break it up and sort out the situation." Upon arriving, he saw Defendant on the concrete face down and handcuffed with mall security standing around him. Detective Arbogast testified, "It happened within a matter of seconds upon our arrival and the time they had him down on the ground." A cell phone and pill bottle were laying next to his body. Detective Arbogast said, "I picked [Defendant] up with mall security and we transported him over to Officer Newbill's car. At the same time I picked up what was his property—or he stated was his property off the ground and took it into my possession." While he and the mall security guard were taking Defendant to the police car, Defendant said he found the bottle outside the mall and he was going to give the contents to some friends he was meeting later at the mall. Defendant was then transported to the APD mall substation. At the APD mall substation the contents of the bottle were field tested, and they were positive for cocaine.

{6} Defendant filed a motion to suppress the cocaine and statements he made regarding the cocaine after it was seized. After an evidentiary hearing, the district court entered findings of facts and conclusions of law and granted the motion to suppress. The district court applied the factors set forth in *State v. Murillo*, 113 N.M. 186, 824 P.2d 326 (Ct.App.1991) to determine the applicability of the Fourth Amendment, and concluded that because the search by the security guards went beyond the scope of protecting their employer's property rights, it was unreasonable under the Fourth Amendment. Defendant's motion to suppress was therefore granted, and under the fruit of the poisonous tree doctrine, Defendant's inculpatory statements were also suppressed. The State appeals, arguing that the security

guards were not state actors and therefore not subject to Fourth Amendment restrictions.

## STANDARD OF REVIEW

{7} "In reviewing the denial of a motion to suppress, the appropriate standard is whether the law was correctly applied to the facts, viewing them in a light most favorable to the court's ruling." *State v. Ingram*, 1998–NMCA–177, ¶ 5, 126 N.M. 426, 970 P.2d 1151. We view the facts as determined by the district court in the light most favorable to its ruling, *In re Josue T.*, 1999–NMCA–115, ¶ 14, 128 N.M. 56, 989 P.2d 431, we indulge all reasonable inferences in support of the district court's ruling, and we disregard all evidence and inferences to the contrary. *State v. Jason L.*, 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856. "Determining the reasonableness of a search, however, is a matter of law." *In re Josue T.*, 1999–NMCA–115, ¶ 14, 128 N.M. 56, 989 P.2d 431. We therefore apply a de novo review to the district court's determination that the search in this case was unreasonable. *Id.*

## ANALYSIS

{8} The Fourth Amendment to the United States Constitution provides in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. Had the search of Defendant's pants pockets and the seizure of their contents been undertaken by the APD officers, the results would not be admissible in a criminal trial under established precedent, and the State does not argue otherwise. *See Ingram*, 1998–NMCA–177, ¶ 6, 126 N.M. 426, 970 P.2d 1151 ("It is well-established doctrine that a police officer, in an encounter with a citizen, may conduct a protective search, known as a *Terry [v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] search, to ensure that the individual is not armed."); *State v. Eskridge*, 1997–NMCA–106, ¶ 24, 124 N.M. 227, 947 P.2d 502 (stating that a police officer concerned about his personal safety during an investigatory stop may check for weapons when he reasonably believes the individual may be armed and dangerous, but the officer is only permitted to pat down the outer clothing of the individual to feel for weapons); *State v. Flores*, 1996–NMCA–059, ¶ 17, 122 N.M. 84, 920 P.2d 1038 (stating that such a protective search is allowed for the limited purpose of protecting the investigating officer and absent probable cause, such a search for weapons may not be expanded into a search for evidence of a crime). In the case before us, the district court found the mall security guard did not perform a pat down search for weapons; he reached into Defendant's pockets and removed items, none of which could have been mistaken as weapons.

{9} The issue in this case is whether the fruits of the search and seizure, undertaken by mall security guards, rather than police, are admissible in a criminal prosecution of Defendant. The issue arises because of the doctrine that the Fourth Amendment does not apply to private individuals who act solely for their own purposes. *See Murillo*, 113 N.M. at 188, 824 P.2d at 328 ("The courts of New Mexico, like other jurisdictions, have accepted the long-standing rule that the protections of the Fourth Amendment do not apply to private individuals acting for their own purposes."). However, for the Fourth Amendment to not apply, the State may not receive the evidence as the result of any instigation by state officials or their participation or involvement in the illegal search. *See State v. Ybarra*, 111 N.M. 234, 237, 804 P.2d 1053, 1056 (1990) ("The government, of course, cannot avoid constitutional restrictions by using a private individual as its agent, nor can it claim that only a private act is involved when government officers, subject to constitutional limitations, have participated in the act. Under such circumstances the constitutional restrictions on governmental activity cannot be said to be inapplicable." (quoting *People v. Jones*, 47 N.Y.2d 528, 419 N.Y.S.2d 447, 393 N.E.2d 443, 445 (1979))); *see also Byars v. United States*, 273 U.S. 28, 33, 47 S.Ct. 248, 71 L.Ed. 520 (1927) ("We do not question the right of the federal government to avail itself of evidence improperly seized by state officers operating entirely upon their own account. But the rule is otherwise when the federal government itself, through its agents acting as such, partic-

ipates in the wrongful search and seizure."). Thus, we have held that the Fourth Amendment applies to "searches effected by a private party who is acting 'as an instrument or agent of the Government.'" *Murillo*, 113 N.M. at 189, 824 P.2d at 329 (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)).

{10} We therefore determine whether the mall security guards in this case were acting "as an instrument or agent of the Government" when they seized and searched Defendant. This requires an analysis to determine whether, and to what extent, police officers of the State were involved with, or connected to, the conduct of the mall security guards. If that involvement or connection is sufficient to conclude that the State was involved, then the conduct will be deemed "state action" with the consequence that its validity will be scrutinized by Fourth Amendment standards.

## A. State Action Under the *Murillo* Test

{11} *Murillo* involved a search conducted by an off-duty investigator employed by the district attorney's office while he was on duty as a private security guard. *Murillo, Id.* at 187, 824 P.2d at 327. We recognized that a commissioned police officer may have incentives to obtain convictions even while he is acting for a private employer. *Id.* at 191, 824 P.2d at 326. Under these circumstances, we concluded that the burden is on the State to show that the officer was acting in a truly private capacity, and to make this determination, we considered the four factors enunciated by the Supreme Judicial Court of Massachusetts in *Commonwealth v. Leone*, 386 Mass. 329, 435 N.E.2d 1036, 1041–42 (1982). *Murillo*, 113 N.M. at 191, 824 P.2d at 331. Those factors are: "(1) whether the guard acted under the control of his private employer; (2) whether the guard's actions clearly related to his private employer's private purposes; (3) whether the search was conducted as a legitimate means of protecting the employer's private property; and (4) whether the methods and manner of the search were reasonable and no more intrusive than necessary." *Id.* In this case, however, there is no indication in the record that any of the Coronado Mall security guards were off-duty police officers. In fact, Security Guard Martin testified he is not a police officer, and he never has been one. Thus, while the factors to be considered by *Murillo* are helpful, they are not dispositive in answering the question posed in this case. Nevertheless, we do consider them for guidance in resolving the ultimate issue before us.

{12} The first *Leone* factor is whether the guard acts under the control of his private employer. *Leone*, 435 N.E.2d at 1041. If the investigation exceeds the guard's private duties or authorization, he may be considered a government actor. *Id.* The record in this case does not reveal what specific duties the Coronado Mall security guards were authorized to perform. However, most courts reason that "the primary function and concern of privately employed security officers is protection of their employers' property, rather than conviction of wrongdoers." *Id.* at 1039–40. Defendant did not threaten to damage any Coronado Mall property; Defendant did not damage any Coronado Mall property; Defendant did not shoplift property from any Coronado Mall store; and Defendant did not otherwise pose a threat to any Coronado Mall property or patrons. The mall security guards exceeded their private duties by chasing Defendant, throwing him to the ground, handcuffing him, and searching him. When they engaged in these activities the mall security guards were not doing anything to safeguard mall property or patrons.

{13} Moreover, the State's assertion that the mall security guards executed a valid citizen's arrest does not withstand scrutiny. Historically, a citizen's power to arrest has been limited to felonies. *See State v. Barreras*, 64 N.M. 300, 304, 328 P.2d 74, 76 (1958) (stating that " 'any person' may, without a warrant, arrest a felon"). There is no claim that Defendant committed a felony that justified the mall security guards in ordering, then throwing Defendant to the ground, handcuffing him, and searching him. We have also noted that at common law a private person could arrest for a breach of the peace committed in his presence. *Downs v. Garay*,

106 N.M. 321, 323, 742 P.2d 533, 535 (Ct.App. 1987). Here, Defendant did not commit a breach of the peace in the presence of the mall security guards. Even if Defendant had committed a breach of the peace within their presence, it is questionable whether the mall security guards could have made a valid citizen's arrest. *See State v. Emmons*, 2007–NMCA–082, ¶ 15, 141 N.M. 875, 161 P.3d 920 ("[T]he Supreme Court [has] specifically declined to favor citizens's arrest for breaches of the peace, stemming from their concern that such an expansion of citizen power might likely lead to more breaches of the peace and encourage vigilantism.").

{14} Secondly, we consider whether the actions of the mall security guards clearly related to the private employer's private purposes. *Leone*, 435 N.E.2d at 1041. A private purpose to be served by an arrest and search might be to detain a shoplifter or to recover merchandise stolen from a store within the Coronado Mall. However, "[a]n investigation that goes beyond the employer's needs cannot be justified as an incident of the guard's private function." *Id.* The conduct of the mall security guards in this case clearly exceeded any private legitimate needs of the Coronado Mall. No legitimate private purpose was being served by chasing Defendant, throwing him to the ground, handcuffing him, and searching him.

{15} Third, "the investigation must be a legitimate means of protecting the employer's property, and so must be reasonable in light of the circumstances surrounding it." *Id.* at 1042. In this case, Defendant posed no threat to the Coronado Mall property, Defendant had not damaged or destroyed any mall property, and the mall security guards did not suspect him of shoplifting.

{16} Finally, we consider whether the method and manner of the search performed by the mall security guards was reasonable and no more intrusive than necessary. *Id.* There was no justification for macing and throwing Defendant to the ground simply because he did not obey their order to get to the ground. Whether they had authority to issue such a command under the circumstances is itself questionable. Furthermore, the search performed by the mall security

guards was clearly more intrusive than necessary. Security Guard Martin testified that it is customary for the mall security guards to conduct a pat down for weapons when there is a confrontation or if a felony has been committed. He also testified: "The only time we're allowed to move something off someone's person is when it poses a threat, like a knife, a gun, something of that nature." The search of Defendant's pockets cannot be characterized as a pat down for weapons, because the pill bottle was clearly not a weapon, and there was no legitimate reason for opening the pill bottle. *See People v. Zelinski*, 24 Cal.3d 357, 155 Cal.Rptr. 575, 594 P.2d 1000, 1006 (1979) (en banc) (concluding that while waiting for the police to arrive, private store security guards who removed a stolen blouse, together with a pill vial from the defendant's purse and opened the pill vial, thereby discovering a fine, powdery substance, later determined to be heroin, "went beyond their employer's private interests").

{17} The mall security guards exceeded their private duties or authorization. They were not protecting their employer's property, nor did they execute a lawful citizen's arrest. If the mall security guards had been off-duty police officers, they would be deemed to be acting as an instrument or agent of the Government, and their conduct would be subject to the Fourth Amendment under *Murillo*.

**B.  State Action Under the Public Function and Government Agent Tests**

{18} The conduct of private security guards who are not off-duty police officers may also be measured under Fourth Amendment constitutional standards in appropriate cases. "When they perform a public function or act as agents of a government investigation, their activities may therefore become state action for constitutional purposes." *Murillo*, 113 N.M. at 189, 824 P.2d at 329. Whether the private officers are performing a public function or are acting as agents of the government is determined as a question of fact. *See id.* at 190, 824 P.2d at 330 ("The general rule appears to be that whether a 'private' person is acting as an agent of the

government is determined as a question of fact in light of all the circumstances.").

### 1. The Mall Security Guards Exercised Public, Police Functions

{19} We conclude the evidence supports a finding that the mall security guards were performing public, police functions in this case. It is evident that "[s]ecurity personnel hired to protect private business premises are performing traditional police functions when they arrest, question, and search for evidence against criminal suspects." *Murillo*, 113 N.M. at 189, 824 P.2d at 329.

{20} We have recognized, as have other courts, that the use of private security forces is expanding in the United States. *Id.* at 190, 824 P.2d at 330. *See Zelinski*, 155 Cal. Rptr. 575, 594 P.2d at 1005 ("We are mindful, however, of the increasing reliance placed upon private security personnel by local law enforcement authorities for the prevention of crime and enforcement of the criminal law and the increasing threat to privacy rights posed thereby."); *People v. Elliott*, 131 Misc.2d 611, 501 N.Y.S.2d 265, 267–68 (N.Y.Sup.Ct.1986) (noting the increasing number of businesses, governmental agencies, neighborhoods, and individuals that are giving private security entities a new role that spills over into public law enforcement areas). The *Zelinski* court notes from a report prepared by the Private Security Advisory Council to the United States Department of Justice, that "the private security sector has become the largest single group in the country engaged in the prevention of crime." *Zelinski*, 155 Cal.Rptr. 575, 594 P.2d at 1005 (internal quotation marks and citation omitted). One study of private policing has recently concluded that today, "private police participate in much of the policing work that their public counterparts do." Elizabeth E. Joh, *The Paradox of Private Policing*, 95 J.Crim. L. & Criminology 49, 51 (2004).

{21} It is clear that, like the public police, private security guards have the potential to violate citizens' constitutional rights. *Murillo*, 113 N.M. at 189, 824 P.2d at 329. It is also evident that a serious danger to constitutional liberties would result if private security guards were allowed to perform these traditional police functions such as arresting, questioning, and searching for evidence, without applying any constitutional protections. *See* 1 Wayne R. LaFave, *Search and Seizure* § 1.8(a), at 260 & n. 29 (4th ed. 2004) ("[T]he grave danger exists that the general admissibility of such evidence may create an atmosphere encouraging government officials to act in clandestine concert with private persons; while concerted activity would undoubtedly taint such evidence and require its exclusion in a criminal action, the problems of proof are obvious." (quoting Note, 63 Colum. L.Rev. 168, 174–75 (1963))); David Alan Sklansky, *Private Police and Democracy*, 43 Am.Crim. L.Rev. 89 (2006) (expressing concerns about privatized policing for American democracy).

{22} These concerns are very real in this case. The website for Coronado Mall (http://www.ggp.com/Content/Data/mallfacts/Coronado'enter_mallfact.pdf) describes it as New Mexico's largest enclosed bi-level mall with over 150 retail stores and 5 anchors within 1,153,954 square feet. The mall has 5,489 parking spaces, employs 19,443 people, and more than 12 million people visit the mall each year. Thus, the mall security guards in this case are responsible for a very large, public area in which millions of people come and go each year. The magnitude of the responsibilities performed by the mall security guards in providing security for the Coronado Mall easily equals or exceeds that of sworn police officers in many towns, cities, and counties in New Mexico.

{23} We therefore align New Mexico with other courts that have expressed realistic concerns about safeguarding our constitutional rights where private police forces are used. To determine whether private security guards are performing public, police functions, we adopt the following test enunciated by *Elliott*, 501 N.Y.S.2d at 269:

These few concerned courts have fashioned a realistic 'public function or acting in the public interest test' which maintains that where organized and structured private security entities or agents assert the power of the state to investigate or make an arrest, or detain persons for subsequent

transfer of custody to the state, or subsequent state law enforcement and the state has acquiesced or allowed such use of public power, such private organized action, in contemplation of state involvement, is sufficient to enable a court to apply constitutional restraints[.]

{24} The mall security guards are structured and organized. They provide security services for businesses and patrons within Coronado Mall. Maintaining public order and keeping the public peace are traditional police functions. The mall security guards wear uniforms which look like APD uniforms; they are called "officers"; and they have rank designations such as sergeant that are similar to those used by a police force. In this particular case, the mall security guards responded to the initial (but erroneous) report of a fight, without APD assistance. The mall security guards then called the APD for "backup," and arrested Defendant, calling the arrest a "citizen's arrest" for disturbing the peace. They kept Defendant under arrest until APD arrived, pursuant to their policy. Simultaneous with the arrest, a mall security guard forcibly searched Defendant, on his own, and upon seizing the pill bottle from Defendant and opening it, said, "Look what we have here. Call APD." We therefore conclude the totality of the circumstances support a finding that the mall security guards were performing public, police functions.

## 2. The Mall Security Guards Acted as Instruments or Agents of the Police

{25} We also conclude that the evidence supports the conclusion that the mall security guards were acting as instruments or agents of the police. The mall security guards employed by Valor Security and the APD work in conjunction with each other in providing security for the Coronado Mall. The APD is provided with a substation in the mall, and the APD assigns police officers to work on the mall premises to provide security. The police officers working at the mall have radios used by the private security guards employed by Valor Security, which enables both forces to communicate directly with each other. In this particular case, Officer Newbill heard the initial report of a disturbance in the mall, but the Valor Security guards apparently intended to handle the matter on their own. When they wanted "backup" the Valor Security dispatch requested APD assistance over its own radio, which two APD officers heard, and they responded in their police units immediately.

{26} Defendant was arrested by the mall security guards with the intent of detaining Defendant until the APD officers arrived, and when the APD officers did arrive, they continued Defendant's arrest by putting him in the APD police unit while still in the handcuffs placed on Defendant by the mall security guards. Once they took custody of Defendant, the intent of the APD officers was to determine if the mall security guards wanted a criminal trespass notification issued to Defendant. If that was their desire, the APD officers would have issued Defendant the notification, telling him he could not return to the mall.

{27} In the meantime, an APD officer picked up the property that the mall security guards had taken from Defendant, and took it into their own possession. An APD officer then opened the pill bottle seized from Defendant, and decided to field test its contents. This action effectively ratified its seizure by the mall security guards. The mall security guard went to the APD substation in the mall to exchange information with the APD officers so he could complete his report.

{28} The evidence in this case demonstrates that the mall security guards and APD were acting cooperatively in a coordinated, concerted undertaking. The conduct of the mall security guards is sufficiently interconnected with the conduct of APD to conclude that they were acting as a team and as an instrument or agent of each other to an extent that makes it appropriate to measure the conduct of the mall security guards by constitutional standards.

## C. Suppression of the Evidence and Its Fruits

{29} We have determined that the search of Defendant must be measured by Fourth Amendment standards for three different reasons, each of which alone is suffi-

cient. Since the search and seizure did not comply with the Fourth Amendment, all evidence discovered as a result of the search and seizure is not admissible in a criminal trial against Defendant. *Ingram,* 1998–NMCA–177, ¶ 9, 126 N.M. 426, 970 P.2d 1151 ("Evidence which is obtained as a result of an unconstitutional search or seizure may be suppressed under the 'exclusionary rule.' ").

{30} While the cocaine itself is clearly the fruit of the unlawful search, the State argues that Defendant's statements should not have been suppressed because there was a sufficient break in the causal chain between the search and Defendant's statements. "Evidence which is obtained by exploitation of a 'primary illegality' will be the fruit of that search and will be suppressed, unless an 'intervening independent act of a free will' can purge the taint of the illegally seized evidence." *Id.* ¶ 10. In determining whether the chain was broken, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant." *State v. Bedolla,* 111 N.M. 448, 455, 806 P.2d 588, 595 (Ct.App.1991) (quoting *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

{31} The State argues that the causal chain was broken because the Defendant voluntarily made the statements to the APD officers, the officers were not present during the search, and the APD's discovery and testing of the drugs were in response to Defendant's statements rather than the search of the mall security guards. We disagree. The mall security guards and the APD officers were acting as a team. The APD officers had a radio monitoring the security guard's frequency. As a result, they knew about the incident and request for immediate back up. In addition, because the APD substation is located in the mall, the police instantly responded. An officer testified that they "drove as fast as [they] could." Furthermore, immediately upon arriving at the scene, an APD officer took Defendant to the police car. Based on this evidence, it is clear that the time between the search and the statements was negligible. In addition,

when the mall security guard took the pill bottle from Defendant and opened it, he said, "Look what we have here. Call APD." APD arrived immediately. The evidence supports a finding that Defendant knew that the APD was called because of the drugs. But for the illegal search by the mall security guards, Defendant would likely not have made any statements to the APD officers.

{32} Therefore, we conclude the evidence supports a finding that Defendant's statements were obtained by an exploitation of the illegal search, that the causal chain between the search and his statements was not broken, and that Defendant's statements were also properly suppressed.

## CONCLUSION

{33} The order of the district court is affirmed.

{34} **IT IS SO ORDERED.**

I CONCUR: RODERICK T. KENNEDY, Judge.

JAMES J. WECHSLER, Judge (specially concurring).

WECHSLER, Judge (specially concurring).

{35} I concur with the majority in affirming the district court's order suppressing the evidence obtained by the mall security guards. I do not, however, concur in much of the majority's analysis in reaching the conclusion that the security guards' activity was subject to the Fourth Amendment.

{36} In analyzing the issue of whether the activity of the security guards was subject to the Fourth Amendment, the majority properly determines that the security guards were acting as instruments or agents of the government when seizing and searching Defendant. In reaching that conclusion, the majority relies on three independent grounds: that the security guards exceeded their private duties or authorization using the test applied in *Murillo;* that the security guards were performing public, police functions under the totality of circumstances; and that the security guards acted as instruments or agents of the APD officers.

{37} I would simply rely on the third ground because it is supported by our analysis in prior opinions and does not require an unnecessary extension of our case law. We have recognized in both *Murillo* and *State v. Hernandez*, 116 N.M. 562, 565, 865 P.2d 1206, 1209 (Ct.App.1993), a case, in contrast to *Murillo*, involving a private security guard who was not also a commissioned law enforcement officer, that a private security guard's actions may constitute governmental action if the guard is "acting as a government agent or instrument." The majority's third ground correctly decides this case on this basis. We need say nothing more. *See Gabaldon v. Erisa Mortgage Co.*, 1997–NMCA–120, ¶ 3, 124 N.M. 296, 949 P.2d 1193 (stating this Court's "general desire to decide cases on narrow rather than broad grounds"), *rev'd in part on other grounds*, 1999–NMSC–039, 128 N.M. 84, 990 P.2d 197.