**Certiorari Denied, February 7, 2017, No. S-1-SC-36258**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2017-NMCA-028**

**Filing Date: December 13, 2016**

**Docket No. 34,462 (consolidated with No. 34,469)**

**STATE OF NEW MEXICO,**

> **Plaintiff-Appellee,**

**v.**

**DARLA BREGAR,**

> **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Briana H. Zamora, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Matthew J. O'Gorman, Assistant Appellate Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**HANISEE, Judge.**

**{1}**    New Mexico State Highway 217, in Bernalillo County, begins in Yrisarri, running east a few miles before abruptly turning due north. From there the road tracks a straight line alongside the Sandia mountain range. Bernalillo County Sheriff's Office (BCSO) Deputy Axel Plum was working a late shift patrolling Highway 217 on the night of December 1,

2008, when he discovered a wrecked Jeep Cherokee by the side of the highway. Deputy Plum found two people on the ground near the Jeep: Defendant Darla Bregar and Thomas Spurlin. Bregar was on the driver's side of the car, her body contorted into a position that Deputy Plum would describe at trial as "grotesque." Spurlin was deceased, his body lying further from the Jeep on the passenger side. Bregar was taken to the hospital by ambulance and survived.

**{2}** Shortly before 5:00 a.m., BCSO Deputies Lawrence Tonna and Gilbert Garcia went to the hospital to interview Bregar. Bregar admitted to driving the vehicle the night before, although she did not remember the crash. Deputy Garcia arrested her and obtained a warrant to have her blood drawn and tested. The result of the test showed that Bregar had a blood alcohol concentration (BAC) of 0.09 at the time of the blood draw.[1]

**{3}** A grand jury indicted Bregar, charging her with one count of vehicular homicide, contrary to NMSA 1978, Section 66-8-101 (2004, amended 2016), and one count of *per se* DWI, contrary to NMSA 1978, Section 66-8-102(C)(1) (2008, amended 2016). At trial, Bregar testified that she did not remember the accident or whether she was driving the Jeep. She maintained that at the time of the accident, she had been wearing a knee brace that would have prevented her from operating a vehicle. Thus, Bregar's defense was that Spurlin was the driver, or at least that the State had failed to prove that Bregar had been driving beyond a reasonable doubt. The jury returned guilty verdicts on both counts charged in the indictment.

**{4}** Bregar's appeal of her conviction concerns the district court's denial of her pretrial motion to suppress her statements to Deputy Tonna at the hospital and its admission of certain expert opinion testimony by Deputy Garcia.

**MOTION TO SUPPRESS**

**{5}** Bregar's argument in district court and on appeal is that her inculpatory hospital-bed statements to the police officers were not voluntarily made, and therefore, their admission into evidence at trial violated her constitutional right to due process of law under the Fourteenth Amendment of the United States Constitution. *See Colorado v. Connelly*, 479 U.S. 157, 163 (1986). We apply a "totality of the circumstances" test to these claims, *Aguilar v. State*, 1988-NMSC-004, ¶ 7, 106 N.M. 798, 751 P.2d 178 (internal quotation marks and citations omitted), derived from the "three-phased process" set out in Justice Frankfurter's opinion for the United States Supreme Court in *Culombe v. Connecticut*, 367 U.S. 568, 603-05 (1961).

> In the first phase, there is the business of finding the crude historical

---

[1]An expert witness for the State at trial estimated that Bregar's BAC would have been around 0.19 at the time of the accident.

facts, the external, 'phenomenological' occurrences and events surrounding the confession. In other words, the court begins with a determination of what happened. We are not restricted to examining only those facts deemed dispositive by the trial court. . . . However, when faced with conflicting evidence, we will defer to the factual findings of the trial court, as long as those findings are supported by evidence in the record. . . .

The second phase is a determination of how the accused reacted to the external facts. This is an admittedly imprecise effort to infer—or imaginatively recreate—the internal psychological response of the accused to the actions of law enforcement officials.

The third phase is an evaluation of the legal significance of the way the accused reacted to the factual circumstances. This requires the application of the due process standards to the court's perception of how the defendant reacted. We are not required to accept the trial court's legal conclusion that the police officers did not act coercively.

*State v. Cooper*, 1997-NMSC-058, ¶¶ 26-28, 124 N.M. 277, 949 P.2d 660 (alteration, internal quotation marks, and citations omitted).

**{6}** A defendant's right to seek exclusion of his or her statements to police on the basis of whether the confessed statement was "voluntary" is legally grounded upon an established principle that the use of "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Connelly*, 479 U.S. at 163 (internal quotation marks and citation omitted). The right to exclude a defendant's statement in state court is derived from Section 1 of the Fourteenth Amendment, which provides that "no [s]tate shall deprive any person of life, liberty, or property, without due process of law." *See Connelly*, 479 U.S. at 163.

**{7}** Whether a statement to police officers is "involuntary" and therefore subject to exclusion under the Fourteenth Amendment does not turn solely on whether the defendant makes a statement of his own free will, however. For example, in *Connelly*, the defendant confessed to committing a murder as a result of "command hallucinations . . . [that] interfered with [the defendant's] . . . ability to make free and rational choices." *Id.* at 161 (internal quotation marks omitted). The Court noted that although "mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Id.* at 165. Instead, there must be some indication that coercive police misconduct brought about the confession. *Id.*; *see also Aguilar*, 1988-NMSC-004, ¶ 20 ("[A d]efendant's mental condition by itself without coercive police conduct causally related to the confession is no basis for concluding that the confession was not voluntarily given.").

3

**{8}**     The district court held a lengthy hearing on the motion to suppress. Four fact witnesses testified for the State about the circumstances surrounding Bregar's confession, and Bregar called a fifth witness to testify as an expert in "general nursing" regarding Bregar's injuries and mental state at the time of the interview—i.e., explaining "how [Bregar] reacted to the external facts." *Cooper*, 1997-NMSC-058, ¶ 27 (internal quotation marks and citation omitted). Bregar herself did not testify at the hearing on her motion to suppress. Although the district court made relatively scant findings of fact, the witnesses' testimony does not conflict in any significant material respect. We therefore summarize each witness's testimony before evaluating the voluntariness of Bregar's statements.

**{9}**     The first witness at the suppression hearing was Deputy Plum, who testified that Bregar was "nonresponsive" when he first saw her at the scene of the crash and that her breathing sounded "distressed[.]" Deputy Plum immediately called for emergency medical assistance, but did not attempt to reposition Bregar so that she could breathe more easily because he was afraid that doing so would aggravate her other injuries.

**{10}**     The second witness to testify at the suppression hearing was Emergency Medical Technician Carol Morgan (EMT Morgan). EMT Morgan testified that she arrived at the accident scene shortly after Deputy Plum called for medical assistance. Bregar was able to tell Morgan her name, but "[i]t was hard to make out what [Bregar] was saying." Morgan smelled alcohol on Bregar's breath and noted that Bregar was unable to observe events around her or comply with simple requests. Bregar's blood pressure was found to be within "the norm for being involved in an accident." Morgan and several other EMTs at the scene strapped Bregar to a long spine board and put her in an ambulance.

**{11}**     Hospital records show that Bregar had a broken jaw, several fractured ribs, seven broken vertebra, and a "subarachnoid hemorrhage that had an overlying hematoma, which means that she received a [blow] to her head, considered a traumatic injury." Bruising, gas, and fluids in and around Bregar's lungs and chest wall would have made it difficult for her to breathe. Bregar was receiving oxygen through a tube inserted into her nose.

**{12}**     EMT Morgan also recalled that hospital personnel assessed Bregar's mental capacity using the "Glasgow Coma Scale " (GCS). The GCS is a ubiquitous assessment of brain trauma using a patient's eye, verbal, and motor responses to instructions. Eye movements are assessed on a scale of 1 to 4, verbal responses on a scale of 1 to 5, and motor responses on a scale of 1 to 6. A GCS Score of 8 is comatose; 15 is considered "normal." Hospital records showed that Bregar's GCS Score was 12 when she was admitted, but that by the next day (it is unclear at what precise time this second assessment occurred), Bregar's GCS Score had reached 15.

**{13}**     The third witness to testify at the hearing on Defendant's motion to suppress was Deputy Tonna. At the time of the crash, Deputies Tonna and Garcia were both members of the BCSO Traffic Investigation Unit, and were dispatched to the scene to conduct an accident investigation. Deputy Tonna was the lead investigator, gathering evidence and

4

documenting the scene of the crash, while Deputy Garcia took photographs and other measurements. Deputy Tonna noted that the damage to the Jeep was "consistent with it being involved in a rollover." He also observed a large bottle of Svedka vodka on the ground near the vehicle, "completely clean[,] like it had just been placed there." Deputy Tonna was told by EMT Morgan that Bregar had a "strong odor of alcohol emanating from her breath, prior to being transported to the hospital."

{14}   Before interviewing Bregar, Deputy Tonna learned that other officers had already been dispatched to the hospital to conduct a DWI investigation, but had been turned away by hospital staff because Bregar "was [still] actively being treated[.]" The interview did not begin until 5:00 a.m., and was not recorded. Deputy Tonna described the interview as follows:

> I started out by identifying ourselves. . . and then I asked [Bregar] if she knew where she was at. She said she was at the hospital. [I] then asked her what had happened with the crash, and at first she said that she didn't wreck. Then, I asked her again where she had been this evening, and she stated that her and Anthony had gone to her friend's, Myra's house, in Tijeras, New Mexico, and that while there, they stayed for two hours and had a few beers.
>
> . . . .
>
> [T]hen I asked her to describe what type of vehicle she had or she drove. She said she had a '97 Jeep Cherokee. Then, I asked her what their plans were after leaving from Myra's house, and she said that—her words were, "I was taking [Mr. Spurlin] home." Then, I asked her if anybody else drives her vehicle, and she said nobody drives her vehicle. I think her words were, "I don't let anybody drive my Jeep."
>
> . . . .
>
> I asked her again how she came to the hospital, and she said she didn't know, and that's when I told her that she had been involved in a rollover crash and that Mr. Spurlin had passed away from his injuries. . . . She became very upset. She started to kind of become hysterical, started crying. . . . She said, "What? I was driving?" And she said, "But I never left home."

{15}   Deputy Tonna also testified about Bregar's appearance and demeanor during the interview. He said that Bregar's "face was really swollen[,] I think she had bloodshot—red, bloodshot, watery eyes, and I could smell a strong odor of alcohol coming from her." Deputy Tonna said that Bregar was slurring her words and "spoke slowly, but she answered the questions." He added that Bregar seemed "conscious and somewhat alert" during the interview. When cross-examined, Deputy Tonna responded that he had no contact with medical personnel regarding Bregar's state of mind or condition and was unaware of

Bregar's injuries beyond what he had learned from EMT Morgan. The interview of Bregar took about ten minutes. At its conclusion, Deputy Garcia notified Bregar that she was under arrest.[2]

{16}    Deputy Garcia was the final State's witness to testify. His testimony as to what Bregar said in response to Deputy Tonna's questions largely mirrored Deputy Tonna's own testimony, so we will not summarize that aspect of Deputy Garcia's account here. Deputy Garcia did provide some further detail as to Bregar's demeanor: Deputy Garcia described Bregar as "awake," "coherent," and observed that "she didn't have any problem answering" Deputy Tonna's preliminary questions about her name, address, and other identifying details. Deputy Garcia testified that after Deputy Tonna told her that Spurlin had died, her demeanor changed: "[a]fter [being told of Spurlin's death], she started telling us that she didn't know where she was[.]"

{17}    Defendant's only witness at the suppression hearing was Michele Wilkie, a nurse called by the defense to testify as an expert. Wilkie's opinion testimony was based on her review of police reports and hospital records. Wilkie opined that Bregar would have been "disoriented" at the time she was interviewed by Deputy Tonna. Wilkie also opined that the lingering effects of alcohol and pain medication would have added to her confusion and lethargic behavior, which in Wilkie's opinion explained why Bregar appeared unresponsive to hospital personnel. Wilkie added that she would not have let Bregar speak with police because she would have been "concern[ed] . . . that she was not stable enough, medically or psychologically, to answer questions regarding the accident." Wilkie believed that any statements Bregar made to the police would be unreliable because "[s]he really didn't know what had happened to her."

{18}    The district court denied the motion to suppress, concluding that "[Bregar's] statement was voluntary and not coerced. The testimony by the officers was credible. The description of the conversation made sense. Her statements were coherent. Her responses were appropriate to the questions asked by the officers."

## DISCUSSION

{19}    On appeal, Bregar makes three related arguments to support her contention that her pre-arrest hospital-bed statements to Deputy Tonna were involuntary. First, Bregar asserts that Deputy Tonna's failure to make an audio recording of the interrogation means that the State failed to carry its burden of proving that her statements were voluntary. *See Cooper*, 1997-NMSC-058, ¶ 30 ("The [state] bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary."). But Bregar did not preserve this

---

[2]The district court ordered that Bregar's post-arrest statements be suppressed because Bregar was not given a *Miranda* warning when she was arrested. The State has not appealed that order.

argument for appellate review by making it to the district court. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]"); *see also State v. Vandenberg*, 2003-NMSC-030, ¶ 52, 134 N.M. 566, 81 P.3d 19 ("In analyzing preservation, [the appellate courts] look to the arguments made by [the d]efendant below."). Bregar's motion to suppress states that "the State has deprived [the district c]ourt of the ability to listen to the actual interview Deputy Tonna conducted with [Bregar] and to review *de novo* whether the deputy overreached[.]" But this is an argument that the district court should not credit Deputy Tonna's recollection of the interrogation because he did not record it with his belt tape. The district court rejected this argument, finding instead that Deputy Tonna's testimony as to what happened was credible. Faced with the district court's decision to accept the police officer's undisputed account of what happened (we note again that Bregar herself did not testify at the hearing) and the fact that we review the district court's assessment of exactly what happened with substantial deference, *Cooper*, 1997-NMSC-058, ¶ 26, Bregar now argues an entirely different proposition on appeal: that as a matter of law, the State's failure to submit into evidence an audio recording of an interrogation means that the State cannot satisfy its burden of proving that a statement was made voluntarily. We decline to address Bregar's first argument because she did not make it below.

**{20}** Bregar's second argument is that Nurse Wilkie's testimony at the suppression hearing established that "Bregar [was] susceptible to confusion[, and t]his type of diminished capacity is recognized throughout voluntariness case law." To the extent that Bregar is arguing that her susceptibility alone rendered her hospital-bed admissions involuntary, Bregar again did not preserve the argument by making it below. Even if she had preserved it, *Connelly* rejected an indistinguishable argument when it held that inculpatory statements made as a result of a mental or physical condition are not sufficient to render the statements involuntary in the absence of a causal relationship between the physical or mental condition and police misconduct. *See* 479 U.S. at 165 (stating that "mere examination of the confessant's state of mind can never conclude the due process inquiry"). Instead, what Bregar must show is that Deputy Tonna obtained Bregar's admission using "intimidation, coercion, deception, assurances, or other police misconduct that constitutes overreaching." *State v. Munoz*, 1998-NMSC-048, ¶ 23, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted).

**{21}** Bregar's final argument is that because Deputy Tonna was at the very least aware that Bregar was under the influence of alcohol at the time he asked her questions, his questioning amounted to "deception and manipulation of a known impairment" and thus requires us to reverse the district court's determination that Deputy Tonna did not use coercion to obtain Bregar's admission. We disagree. Initially, we note that Nurse Wilkie's testimony was far from unequivocal about whether the medical records established that Bregar was susceptible to coercion. While she testified that a subarachnoid hemorrhage and lingering influence of alcohol and pain medication would have caused Bregar to feel disoriented, confused, and lethargic, Wilkie also noted that Bregar was scoring a 15 on the GCS (i.e., a normal level of consciousness) by the next day. Deputy Tonna and Deputy

7

Garcia's testimony that Bregar seemed responsive and aware of the circumstances during their interview—which the district court credited—supports a finding that Bregar was lucid and not otherwise specifically susceptible to coercion. The deputies testified that Bregar told them she knew she was in the hospital, that she "spoke slowly, but . . . answered the questions[,]" and seemed "conscious and somewhat alert" during the interview. Significantly, Bregar immediately retracted her admission and denied being the driver when she was informed that Spurlin had died as a result of the accident. The fact that Bregar changed her story and denied driving when she found out that Spurlin had died suggests that Bregar was not suffering from a diminished capacity at the time of her admissions. In other words, this evidence suggests that Bregar was aware that a police officer was asking her questions and that her answers to those questions could implicate her in the commission of a crime. *See id.* ¶ 21 ("[I]f [a] confession is the product of an essentially free and unconstrained choice by its maker, that is if [s]he has willed to confess, it may be used against [her]." (internal quotation marks and citation omitted)).

**{22}** But even if Bregar had demonstrated some susceptibility to coercive police interrogation techniques, Bregar would need to point to coercive conduct by the police that caused her to admit to being the driver. *See id.* ¶ 23. Here, the district court record does not support such a contention. In this regard, we note Deputy Tonna had no contact with medical personnel regarding Bregar's state of mind or condition and was unaware of Bregar's injuries beyond what he had learned from EMT Morgan. While he had been made aware that hospital personnel would not allow Bregar to be interviewed while being actively treated, nothing in the record suggests that Bregar's treatment was ongoing when Deputy Tonna spoke with her. Thus, there is no direct evidence that Deputy Tonna knew of any specific condition from which Bregar suffered and sought to exploit it by questioning her.

**{23}** The circumstantial evidence supports a similar conclusion. First, Deputy Tonna's conversation with Bregar was less than 10 minutes long, so there is no indication that Deputy Tonna deliberately prolonged the encounter with the hope of overcoming Bregar's resistance to questioning. *See id.* ¶¶ 35-36 (rejecting argument that a 100-minute-long interrogation "in conjunction with other factors" rendered a confession involuntary and citing other cases where confessions during even longer periods of questioning were found to be voluntarily made); *see also State v. LaCouture*, 2009-NMCA-071, ¶¶ 13-14, 146 N.M. 649, 213 P.3d 799 (finding admissions made during seven-minute hospital-bed interview voluntary). Deputy Tonna's open-ended questions to Bregar asking her to describe the vehicle she drives, what she was doing the previous night, and her interaction with Spurlin did not suggest answers or otherwise pressure Bregar to admit that she was the driver. *Cf. State v. Rettenberger*, 1999 UT 80, ¶ 40, 984 P.2d 1009 (finding a confession involuntary where, among other facts, the defendant's "confession contain[ed] little information that was not first provided or suggested by the interrogating officers"). Nor is there any indication that Bregar was restrained or isolated by police during her interrogation: any immobility was incidental to her hospitalization for injuries suffered during the accident, not a police effort to coerce statements by isolating the defendant. *See State v. Maestas*, 2012 UT App 53, ¶ 33, 272 P.3d 769 ("[The] Officer . . . did not cause [the d]efendant to be isolated from his friends

8

and family or to be connected to medical equipment. Hospital policy and medical treatment, not police tactics, caused [the d]efendant's isolation and lack of mobility[.]").

{24}     In *LaCouture*, we evaluated a factually similar hospital-bed admission and ultimately concluded that it was not an involuntary confession under the Fourteenth Amendment. There, the defendant admitted to taking methamphetamine earlier that day and had suffered injuries from a car accident, including "damage to his hip and spine, broken ribs, fractured leg bones (both tibia and fibula), and internal bruising." 2009-NMCA-071, ¶¶ 4, 12. We held that the defendant's statements were voluntary because "[d]espite these injuries, [the defendant] was able to respond coherently" to the police officer's questions, and there was no indication that the police officers had "threaten[ed him], promise[d] special treatment in return for [his] cooperation, physically abuse[d him], or engage[d] in coercion of any type." *Id.* ¶¶ 12-13. We further noted that the questions the officer asked "were benign, revolving around the facts of the accident." *Id.* ¶ 13.

{25}     Both Bregar and the defendant in *LaCouture* suffered injuries from a car accident, were under the influence of mind-altering substances, and were confined to a hospital bed at the time of questioning by police officers. Bregar emphasizes that unlike the defendant in *LaCouture*, Bregar suffered a traumatic brain injury as a result of the accident. But as we have already noted, Deputy Tonna did not know of this injury; he cannot have intended to take advantage of an injury that he did not know Bregar had suffered. Bregar asserts that Deputy Tonna failed to "ascertain . . . Bregar understood what was going on" before asking her questions. But she does not explain why Deputy Tonna's preliminary questioning of Bregar to ascertain that she knew where she was and Deputy Garcia's testimony that she seemed "awake" and "coherent," and "didn't have any problem answering" Deputy Tonna's questions is a legally significant distinction from the officer in *LaCouture* asking the defendant if he "understood" the questions he was being asked. 2009-NMCA-071, ¶¶ 12, 18. In any event, while a police officer's subjective knowledge of an infirmity may be probative of a finding that the officer sought to exploit it through coercive police tactics, Bregar does not explain why an *absence* of such knowledge is the same. *See Maestas*, 2012 UT App 53, ¶ 40 ("A police officer is not routinely required to inquire into a defendant's medical condition prior to questioning him. . . . This is especially true of those injured in auto accidents, with which most police officers will have extensive experience and a meaningful frame of reference, and thus less need to seek guidance about the effects of trauma." (citations omitted)). To the extent that Bregar is arguing that officers have an affirmative duty to ascertain an interviewee's medical condition prior to asking questions, the argument was NOT preserved below, so we have no need to grapple with the practical ramifications of such a rule or how it might affect the outcome of this appeal. *See id.* ¶ 40 n.8 (noting that "[a]pplicable patient privacy laws and hospital privacy regulations may well have prevented hospital personnel from sharing" information about a patient's injuries with an investigating officer). Applying *Cooper*'s three-phase totality-of-the-circumstances test, we conclude that Bregar's admission to Deputy Tonna was not the result of coercion and so is not subject to suppression under the Due Process Clause of the Fourteenth Amendment. Accordingly, we affirm the district court's denial of Bregar's motion to suppress those statements.

**The District Court's Admission of Deputy Garcia's Opinion Testimony**

**{26}** At trial, the district court permitted Deputy Garcia (the same Deputy Garcia who photographed and measured the accident scene and who accompanied Deputy Tonna when Bregar was interviewed at the hospital) to separately testify as an expert in accident reconstruction. In that capacity, Deputy Garcia informed the jury of his opinion that Bregar was driving the Jeep when it crashed. This opinion was based on several inferences and assumptions that we summarize here before addressing Bregar's argument that the opinion should have been excluded. First, Deputy Garcia considered the location of "yaw" marks on Highway 217 where the Jeep left the road and tumbled down a 3- to 5-foot embankment. Deputy Garcia found "trip" marks where the front left tire of the Jeep caught the dirt on the embankment as it rolled. Based on the "yaw" and "trip" marks and damage to the tires on the left-hand side of the Jeep, Deputy Garcia concluded that as the Jeep left the road it rolled over twice on the driver's side before coming to a rest. Spurlin's body was found on the passenger side of the Jeep about 15 feet away, and Bregar was found on the driver's side of the Jeep, closer to it. Important to Deputy Garcia's assessment, the only window of the Jeep that had been broken during the rollover was that on the front passenger side, so Deputy Garcia reasoned that both Bregar and Spurlin were ejected from the Jeep through the same window.

**{27}** From this, Deputy Garcia posited that Bregar was the driver because Spurlin was closer to where the Jeep rolled over the first time, while Bregar was found closer to where the Jeep came to rest on the driver's side. Asked how Bregar ended up on the driver's side of the Jeep when it was his opinion that she was ejected from the passenger window, Deputy Garcia explained that "when [Bregar was] getting ejected . . . [the] vehicle [was] tossing her body towards the direction it's rolling." On cross-examination, Deputy Garcia agreed with Bregar's attorney that if Bregar had indeed been thrown from the passenger-side window, his opinion required him to "assume" that Bregar had flown over the car in order to land on the driver's side of the Jeep.

**DISCUSSION**

**{28}** Bregar makes three arguments on appeal: (1) the district court abused its discretion when it found that Deputy Garcia was qualified under Rule 11-702 NMRA to offer an expert opinion about "occupant kinematics"; (2) Deputy Garcia's opinion "was based on personal opinion rather than a well-recognized scientific principle"; and (3) Deputy Garcia "was unaware of the predicate facts necessary to make his opinion relevant." We must first sort out our standard of review in this instance, which depends upon whether these issues were raised below or are newly raised to this Court. To this end, if an evidentiary issue is preserved by objection, we review the district court's decision to admit or exclude evidence for an abuse of discretion, which means the decision was "clearly against the logic and effect of the facts and circumstances of the case." *State v. Loza*, 2016-NMCA-088, ¶ 10, 382 P.3d 963 (internal quotation marks and citation omitted). If an appellant fails to object to the admission of evidence below, on appeal we will only review for plain error: that is, an error

that "affect[s] a substantial right[.]" Rule 11-103(E) NMRA.

**{29}**    Bregar concedes that her second and third arguments were not preserved and therefore subject to review for plain error, but argues that her first argument was preserved and therefore subject to review for an abuse of discretion. We disagree. Bregar's attorney made the following objections to Deputy Garcia's qualification to testify as an expert: his testimony to the jury (beyond offering his own personal observations at the accident scene) would not be helpful because the "car . . . lost control, went off the road, went into the ditch, and rolled"; his opinion that both occupants of the Jeep were ejected from the front passenger window was a "legal conclusion[ and] a question for the jury"; and his testimony as to which Jeep occupant was in which seat, and who was ejected first, was based on "[f]acts not in evidence at this point." Stated simply, it is difficult to point to anything within the objections made that appears to challenge Deputy Garcia's qualification to present expert testimony or the methodology by which his opinion was formed. As we have stated, for an objection to preserve an issue for appeal, "it must appear that [the] appellant fairly invoked a ruling of the [district] court on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717. We require parties to preserve their arguments by making them in the district court, in part, in order to

> (1) . . . specifically alert the district court to a claim of error so that any mistake can be corrected at that time, (2) to allow the opposing party a fair opportunity to respond to the claim of error and to show why the court should rule against that claim, and (3) to create a record sufficient to allow this Court to make an informed decision regarding the contested issue.

*Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 56, 146 N.M. 853, 215 P.3d 791. Notably, Bregar's district court challenge to Deputy Garcia's expert qualifications lacked any reference to "occupant kinematics" and this specific aspect of accident reconstruction was only addressed for the first time on appeal. The district court—presented instead with evidence that Deputy Garcia was trained and certified in accident reconstruction, had investigated nearly 500 crashes including 100 involving fatalities, and had been qualified as an expert witness in accident reconstruction—was therefore unable to correct any error in qualifying Deputy Garcia as an expert (if indeed it was error) that Bregar now specifically focuses on for the first time on appeal. Moreover, the State was prevented from responding below to the specific challenge now raised and we are denied the opportunity to examine a meaningfully developed record. Accordingly, the question of Deputy Garcia's qualifications to testify in accident reconstruction from the standpoint of occupant kinematics was not preserved.[3]

---

[3]We note that the State informed the district court that it would ask Deputy Garcia about the origin and movements of Spurlin and Bregar's bodies before and during the crash at the very end of the colloquy on Deputy Garcia's qualifications after the trial court had already found that he would be permitted to offer expert testimony about his reconstruction

**{30}**     Having determined that all of Bregar's arguments are subject to review for plain error, we shall address the remainder of our analysis separately. First, we discuss whether any one of the three arguments Bregar makes on appeal shows that the district court erred. Second, we discuss whether the error was plain; in other words, whether any of the errors raise sufficiently "grave" concerns about the validity of the jury's guilty verdict that we must reverse it despite Bregar's failure to adequately object to Deputy Garcia's expert testimony below. *State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056.

**{31}**     Rule 11-702 NMRA, which governs the admissibility of expert opinion testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

The proponent of expert testimony under Rule 11-702 must show "(1) the witness . . . [qualifies] as an expert; (2) the specialized testimony [will] assist the trier of fact; and (3) the expert witness testimony [will] be limited to scientific, technical, or other specialized knowledge in which the witness is qualified." *Andrews v. U.S. Steel Corp.*, 2011-NMCA-032, ¶ 11, 149 N.M. 461, 250 P.3d 887 (citing *State v. Alberico*, 1993-NMSC-047, ¶¶ 43-45, 116 N.M. 156, 861 P.2d 192).

**{32}**     When expert witness testimony involves scientific knowledge, as the parties do not dispute to be the case here, "the proponent of the testimony must establish the reliability of the science and methodology on which it is based." *Andrews*, 2011-NMCA-032, ¶ 13. "[I]t is error [for the district court] to admit expert testimony involving scientific knowledge unless the party offering such testimony first establishes the evidentiary reliability of the scientific knowledge." *State v. Torres*, 1999-NMSC-010, ¶ 24, 127 N.M. 20, 976 P.2d 20. Whether scientific knowledge is reliable in turn requires an inquiry into whether the knowledge is derived from "established scientific principles or methods." *Andrews*, 2011-NMCA-032, ¶ 13. New Mexico courts apply a non-exhaustive "list of factors" for answering this question:

---

of the accident. No objection was made by Bregar's attorney at the time, although we note that our rules of preservation do not apply where "a party has no opportunity to object to a ruling or order at the time it is made[.]" Rule 12-216(A) NMRA. But Bregar does not argue this basis for preservation on appeal, and our review of the record indicates that her trial counsel had numerous opportunities to object to Deputy Garcia's qualification to testify to his opinion that Bregar was the driver based on the movement and position of bodies during and following the crash, but did not.

(1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; (4) whether the theory or technique has been generally accepted in the particular scientific field; and (5) whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture.

*Id.* ¶ 14.

**{33}** As we have stated, Bregar first argues that "the district court erred in finding [Deputy Garcia] qualified to give an opinion about 'occupant kinematics'—i.e., the study of the movement of bodies in an accident." In essence, Bregar contends that "calculat[ing] a person's potential ejection from a vehicle during a rollover from the actual resting location of the occupant . . . requires scientific or technical expertise" that Deputy Garcia did not possess. This expertise, Bregar contends, consists of using "seven . . . equally dense physics equations [to] get a basic idea of the number and timing of rolls over the entire distance of the accident." Bregar contends that additional equations are required to determine "the passenger's ejection trajectory at every moment of the car's rollover." Ultimately, Bregar contends that "[t]his simplified ejection model does not generate a certain ejection point, but rather multiple possible ejection points." Nor does it account for accidents like the Jeep here involving yaw: in that case, additional equations are required. *See generally* Chad B. Hovey et al., *Occupant Trajectory Model Using Case-Specific Accident Reconstruction Data for Vehicle Position, Roll, and Yaw*, from *Society of Automotive Engineers Technical Paper Series*, #2008-01-0517 (SAE Int., April 2008), http://www.hoveyconsulting.com/pdf/Hovey%202008%20Occupant%20Trajectory.pdf. Because Deputy Garcia did not apply these principles in reaching his conclusion that Bregar was driving the Jeep, Bregar contends that the district court abused its discretion in allowing him to so testify.

**{34}** The problem with this argument is that it fails to address the question of whether Deputy Garcia's opinion was itself based on a reliable scientific methodology. *See Andrews*, 2011-NMCA-032, ¶¶ 13-14. Even if one method (here, occupant kinematics) is the "gold standard" in a field, that does not preclude the use of scientific methods that otherwise meet the baseline reliability criteria of Rule 11-702. *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 105 (Ky. 2008); *see also Chapin v. A & L Parts, Inc.*, 732 N.W.2d 578, 587 (Mich. Ct. App. 2007) ("The only proper role of a trial court [in evaluating the admissibility of expert testimony] is to filter out expert evidence that is unreliable, not to admit only evidence that is unassailable."). As we have noted, Deputy Garcia was trained, certified, and experienced in accident investigation and reconstruction, assigned to a team of deputies tasked with investigating accidents, and had previously testified as an expert in accident reconstruction. On the record before it, we cannot conclude that the district court committed

13

plain error in deciding Deputy Garcia was qualified to testify as an expert in the general field of accident reconstruction in this case.

**{35}** We think Bregar's second argument—that is, her argument that Deputy Garcia's ultimate opinion was not the result of his expertise in accident reconstruction—is better understood as an argument that the State did not satisfy its burden of showing that Deputy Garcia's opinion (that Bregar was ejected through the passenger window second and therefore was the driver of the crashed Jeep) was the result of a reliable methodology. Viewed this way, we agree with Bregar that the State failed to meet its burden as the proponent of this testimony to establish that Deputy Garcia was qualified to offer this opinion as an expert under Rule 11-702. Accordingly, had Bregar objected to Deputy Garcia's scientific methodology as to this determination, it would have been an abuse of discretion to admit Deputy Garcia's opinion that Bregar was the driver. *See Andrews*, 2011-NMCA-032, ¶ 11 (noting that the proponent of expert witness testimony must prove that the witness is qualified to offer an opinion based on application of scientific methodology).

**{36}** As we have explained above, the threshold question in determining the admissibility of expert opinion testimony based on scientific knowledge is whether the proponent of such testimony has shown that the knowledge or method in question is reliable. *Id.*; *see also Torres*, 1999-NMSC-010, ¶ 24 (same). Here, we conclude the State failed to meet its burden. To reiterate, the testimony that the State elicited from Deputy Garcia was that he had been certified as an accident reconstruction expert by the Institute of Police Management, had performed at least fifty reconstructions of "[f]atal[]" car accidents, and that he had been "involved with" many more investigations into non-fatal car accidents. But this testimony, standing alone, does not provide a basis for any meaningful evaluation of whether his ultimate opinion—that Bregar was driving the Jeep—was a result of the application of a reliable scientific method. The State needed to put forward some evidence or testimony that revealed the *content* of his formal qualifications—i.e., what he was taught in accident reconstruction class, what certification with the Institute of Police Management requires, and what methods (mathematical or otherwise) he uses to reconstruct an accident—in order to enable the district court to assess the reliability of these methods in producing the his resulting opinion that Bregar was the driver of the crashed Jeep. Having failed to do so, the district court abused its discretion by allowing Deputy Garcia to opine to the jury that Bregar was driving the Jeep.

**{37}** To be sure, Deputy Garcia elaborated on his opinion when he testified before the jury that Bregar was the driver because the passenger side window was the only window that broke during the accident, so the first person to be thrown from the Jeep would have had to have been in the passenger seat. Deputy Garcia explained that a rolling vehicle was like a "merry-go-round[,]" in that "when you're getting ejected out, you're going the direction that the vehicle is rolling over." But neither this testimony nor anything else in the record provides a basis for gauging the reliability of Deputy Garcia's "merry-go-round" methodology of extrapolating the position previously occupied by a person who is thrown from a vehicle. *See* Rule 11-702. For all we can tell from the record, it is an ad-hoc theory

14

that he had used only in this one case. Even viewing Deputy Garcia's qualifications and experience generously, there is no basis to find that his opinion in this regard was the result of a reliable methodology, as Rule 11-702 requires. There is no evidence that his theory has been tested, that it had been subjected to peer review and publication, whether it had a known potential rate of error, whether the theory or technique has been generally accepted in the particular scientific field, or whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture. *See Andrews*, 2011-NMCA-032, ¶ 14. The State cites *State v. Vigil*, 1985-NMCA-110, ¶¶ 12,14, 103 N.M. 643, 711 P.2d 920, as holding that accident reconstruction expertise is reliable as a matter of law with respect to opinions regarding body movements during accidents. But *Vigil* was decided when the prevailing test for the admissibility of expert testimony was *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir.1923), which established the "general acceptance" test for the admissibility of an expert opinion. Under *Frye*, the test for the admissibility of expert opinion testimony based on scientific knowledge is whether the "scientific technique or principle about which the expert proposes to testify . . . [is] accorded general scientific recognition." *Alberico*, 1997-NMSC-047, ¶ 39 (internal quotation marks and citation omitted). The *Frye* test was subsequently rejected by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)(holding that the *Frye* test was superceded by the adoption of the Federal Rules of Evidence), and our own Supreme Court in *Alberico*, 1993-NMSC-047, ¶¶ 2, 97. As *Alberico* noted, the problem with this test is that its "inherent vagueness . . . creates ambiguities as to the scope of the pertinent field or fields to which the scientific technique belongs." *Id.* ¶ 41. This case illustrates that concern. Accident reconstruction may be a well-accepted method for determining the movement of vehicles during a car accident, but that does not mean that every opinion offered by experts in accident reconstruction is generally accepted (under *Frye*) or reliable (under our modern Rule 11-702 test).

**{38}** Moreover, to the extent that *Vigil* remains good law after *Daubert* and *Alberico*'s rejection of the *Frye* standard, we find it (and the other out-of-state cases cited by the State) factually distinguishable. In *Vigil*, the district court specifically determined that the witness's expertise in the field of accident reconstruction "qualified [him] to determine the movement of bodies within the vehicle." 1985-NMCA-110, ¶¶ 12-14. Here, the district court never made any finding that Deputy Garcia's opinion regarding Bregar's position fell within the scope of his expertise in accident reconstruction. Indeed, after Deputy Garcia's testimony had concluded, the district court stated that "Deputy Garcia gave more opinions than [the district judge] was anticipating, some of which I wasn't comfortable with." Moreover, the expert in *Vigil* had testified as to his "training and knowledge of physics and engineering," which the court found sufficient to put the expert's testimony within the trial court's "broad" discretion in determining its admissibility. *Id.* ¶ 16. Here, although Deputy Garcia testified that he was certified as an accident reconstruction expert and had taken an accident reconstruction course, the State did not elicit any testimony from Deputy Garcia to elaborate on what these formal qualifications entailed. In other words, even if it is within the discretion of a district court to conclude that training in and knowledge of physics and engineering is

15

sufficient to make a witness competent to testify about the movement of bodies during a car accident, the total lack of evidence that Deputy Garcia had such training precluded the district court in this case from allowing his expert testimony to be presented to the jury. Accordingly, it was error for the district court to allow Deputy Garcia to testify as an expert that in his opinion Bregar was the driver under Rule 11-702. We therefore do not separately address Bregar's third argument that the admission of this testimony was in error, and proceed to analyze whether the admission of Deputy Garcia's expert testimony satisfies our plain error standard of review.

**{39}** As we have noted above, our Supreme Court has stated that the standard of review for plain error is whether the erroneous admission of evidence creates "grave doubts concerning the validity of the verdict." *Montoya*, 2015-NMSC-010, ¶ 46 (internal quotation marks and citation omitted). Our Supreme Court has elsewhere characterized the standard of review for plain error as involving some determination of whether "there has been a miscarriage of justice or a conviction in which the defendant's guilt is so doubtful that it would shock the conscience of the court to allow it to stand." *State v. Lucero*, 1993-NMSC-064, ¶ 13, 116 N.M. 450, 863 P.2d 1071.

**{40}** In *Lucero*, an expert witness for the State diagnosed the alleged victim of the defendant's child abuse with post-traumatic stress disorder (PTSD), opined that the complainant's symptoms were "consistent with those in children who have been sexually abused[,]" and that "the cause of the complainant's PTS[D] was the sexual molestation that she had been undergoing." *Id.* ¶ 4. The expert also "recounted several statements regarding sex abuse that the complainant had made to her during her evaluation to the effect that her uncle had 'done it to her.' " *Id.* ¶ 5. Finally, the expert witness

> commented directly on the complainant's credibility. For example, she testified that the complainant 'was consistent in saying that it was her uncle' and was consistent in referring to the rooms in which she was subjected to sexual abuse. [The expert] also commented on the complainant's demeanor, which she said changed when talking about the sex abuse that she endured. She stated that if the complainant were not telling the truth, she probably would have reacted differently than she did.

*Id.* ¶ 6. Our Supreme Court found that it was plain error to admit this testimony for three reasons. First, the witness "comment[ed] directly [on] the credibility of the complainant[,]" *id.* ¶ 15; second, by naming the defendant as the victim's abuser, the expert's testimony "was tantamount to saying that the complainant was telling the truth[,]" *id.* ¶ 16; and third, the expert's testimony amounted to a direct statement that the complainant's "PTSD symptoms were in fact caused by sexual abuse." *Id.* ¶ 17. These errors, the Court found, were plain because they affected " 'substantial rights although the plain errors were not brought to the attention of the judge.' " *Id.* ¶ 13 (alteration omitted) (quoting Rule 11-103(D) (1993), currently Rule 11-103(E)).

16

**{41}** In *Montoya*, the expert witness was a pathologist who had conducted an autopsy on the body of a baby whom the defendant had allegedly killed. The expert

> opined that the injuries to [the victim's] ears were intentional, caused by someone grabbing and pulling them, and could not have been caused by the [victim] herself. [The expert] saw between forty and fifty bruises on [the victim's] back, chest, and abdomen. The [victim] also had subdural and subarachnoid hemorrhages on both sides of the brain, indicative of significant head trauma. [The expert] said these types of injuries were unlikely to be caused by a fall in a bathtub. [The expert] also found significant internal abdominal injuries, which she characterized as classic intentional injuries found in children who were punched or kicked in the stomach.
>
> [The expert] said that [the victim's] death was the result of multiple blunt force injuries. [The expert] concluded that the constellation of injuries on [the victim's] body was a result of intentional, nonaccidental trauma, and that the manner of death was homicide, which she defined as death at the hands of another.

2015-NMSC-010, ¶¶ 12-13. The Court found that the admission of this testimony was not plainly erroneous, distinguishing *Lucero* based on the fact that the expert had not identified the defendant as the person who had caused the injuries, and "unlike *Lucero*, where the expert likely sealed the defendant's fate with her testimony alone, in this case there is ample evidence outside of [the expert's] testimony to support the jury's finding of guilt." *Montoya*, 2015-NMSC-010, ¶ 49.

**{42}** Although *Montoya* is one of our Supreme Court's most recent applications of the plain error standard, its holding appears to be in tension with *Lucero* and other cases from the same court. According to *Montoya*, the standard of review for plain error is roughly the same as the analysis for constitutional fundamental error: "the [appellate court] must be convinced that admission of the testimony constituted an injustice that created grave doubts concerning the validity of the verdict." 2015-NMSC-010, ¶ 46 (internal quotation marks and citation omitted). But *Lucero* states that the standard of review for plain error is simply whether the error "affect[s] substantial rights[,]" a standard which the court itself characterized as "less stringent" than the standard of review for constitutional fundamental error. 1993-NMSC-064, ¶ 13 (internal quotation marks and citation omitted); *see also State v. Torres*, 2005-NMCA-070, ¶ 9, 137 N.M. 607, 113 P.3d 877 ("The plain error doctrine is not as strict as the doctrine of fundamental error in its application."). By contrast, in the analogous circumstance of harmless error review (where the state bears the burden of proving that an error preserved by the defendant should not result in reversal, instead of the defendant bearing the burden of showing that an unpreserved error should), our Supreme Court has stated that courts should look to the effect that the error had on the jury's conclusion, not whether the other evidence that was presented would have allowed the jury to reach the same conclusion. *See State v. Tollardo*, 2012-NMSC-008, ¶ 42, 275 P.3d 110.

17

This standard is close to the federal interpretation of the "affects substantial rights" prong of plain error review, which the U.S. Supreme Court has said "in the ordinary case means it affected the outcome of the district court proceedings[] and . . . the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (alteration, internal quotation marks, and citations omitted).

**{43}** But we need not attempt to reconcile these cases here, because we hold that Bregar cannot satisfy her burden of showing that the admission of Deputy Garcia's expert testimony was plainly erroneous under a more permissive standard. Unlike the expert in *Lucero*, Deputy Garcia did not "comment directly [on Bregar's] credibility." 1993-NMSC-064, ¶ 15. Moreover, Deputy Garcia's opinion was not the sole or primary item of evidence indicating Bregar's guilt. Our review of the record makes clear that the unified focus of Bregar's defense was to attack the evidentiary value of Bregar's hospital-bed admissions. And, apart from Deputy Garcia's expert opinion, additional circumstantial evidence that Bregar was the driver figured prominently in the State's case.

**{44}** In this regard, the jury was instructed that it was to determine whether Bregar's statement was voluntarily made, and both the State and the defense devoted significant portions of their closing statements arguing the issue of whether the jury should credit Bregar's statement. Indeed, Bregar's counsel explained that her lengthy and repeated arguments concerning the voluntariness and the accuracy of the deputies' recollections of the statement were made because that evidence was "so important" to the State's case. The State conceded as much, but did not argue that the jury should believe Bregar's confession was voluntary because of Deputy Garcia's testimony. Instead, the State placed primary emphasis on the fact that Bregar had changed her story when she found out that Spurlin had died, inconsistencies in the testimony of the witness that Bregar had called to the stand to testify that she was not the driver, the fact that Spurlin did not have a driver's license, that Bregar admitted she owned the Jeep, and that her occupation was serving as Spurlin's live-in caretaker. Finally, the State attacked Bregar's defense that her leg brace prevented her from driving the Jeep by presenting photographic evidence that the driver's seat of the Jeep was found positioned much further back than the passenger's seat. While Bregar's attorney attacked Deputy Garcia's credibility as an expert in closing, her chief concern was attacking his credibility as a lay witness, highlighting circumstantial evidence that Spurlin was the driver (such as the presence of his urine on the driver's seat) and witness testimony to the same effect. Viewed against this independent evidence of Bregar's guilt, we can conclude that Deputy Garcia's expert opinion did not likely affect the outcome of the jury's deliberations. Thus, the district court's erroneous admission of Deputy Garcia's ultimate conclusion as an expert witness was not plain error. Accordingly, we will not reverse the district court's judgment on this ground.

**Sufficiency of the Evidence**

**{45}** Bregar's final argument on appeal is that the State failed to present sufficient evidence to establish the corpus delicti of vehicular homicide. "The corpus delicti rule

18

provides that 'unless the corpus delicti of the offense charged has been otherwise established, a conviction cannot be sustained *solely* on the extrajudicial confessions or admissions of the accused.' " *State v. Weisser*, 2007-NMCA-015, ¶ 10, 141 N.M. 93, 150 P.3d 1043 (alteration omitted) (quoting *State v. Paris*, 1966-NMSC-039, ¶ 6, 76 N.M. 291, 414 P.2d 512). New Mexico courts apply the "modified trustworthiness rule" set forth in *Paris*. *State v. Wilson*, 2011-NMSC-001, ¶ 15, 149 N.M. 273, 248 P.3d 315, *overruled on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37. "[T]he existence of the corpus delicti is demonstrated by the fact that a harm or injury occurred and that the harm or injury was caused by a criminal act." *Weisser*, 2007-NMCA-015, ¶ 10.

**{46}** Under New Mexico's "modified trustworthiness rule" approach, "a defendant's extrajudicial statements may be used to establish the corpus delicti [of the charged crime] when the prosecution is able to demonstrate the trustworthiness of the confession and introduce some independent evidence of a criminal act." *Wilson*, 2011-NMSC-001, ¶ 15. This independent evidence can consist of either "direct or circumstantial evidence, but such evidence must be independent of a defendant's own extrajudicial statements." *Weisser*, 2007-NMCA-015, ¶ 12 (citations omitted). We review de novo any claim that the State failed to prove the corpus delicti of the charged offense, but we take all findings of fact that support a conviction as given if supported by substantial evidence. *Wilson*, 2011-NMSC-001, ¶ 17.

**{47}** The jury was instructed that it should find Bregar guilty of vehicular homicide if the State proved beyond a reasonable doubt that she "operated a motor vehicle while under the influence of intoxicating liquor. . . [and Bregar] thereby caused the death of [Mr.] Spurlin[.]" *See* § 66-8-101(A) (defining homicide by vehicle as "the killing of a human being in the unlawful operation of a motor vehicle"); § 66-8-102(A) ("It is unlawful for a person who is under the influence of intoxicating liquor to drive a vehicle within this state.").

**{48}** Bregar argues that because her confession was the only evidence in support of the jury's finding that Bregar was the driver, her conviction must be reversed. But the State presented independent circumstantial evidence to prove the corpus delicti of homicide by vehicle, including photographs showing that the driver's seat of the Jeep was reclined and pushed much further back than the passenger seat. Because Bregar was wearing a leg brace at the time of the accident, this evidence could have supported a conclusion that Bregar, not Spurlin, was driving the Jeep at the time of the accident. Bregar argues that this evidence cannot be considered because the photographs were taken by Deputy Garcia, and his expert testimony (which we addressed above) was presented in error. But Bregar does not provide any support for her implicit assertion that admission of car accident photographs taken by an investigating officer are subject to Rule 11-702. Accordingly, we do not consider it any further. "[W]here arguments in briefs are unsupported by cited authority, [we assume that] counsel[,] after diligent search, was unable to find any supporting authority." *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329.

**{49}** Bregar does cite cases where we found the corpus delicti wanting where the evidence

19

is "susceptible to multiple inferences" both for and against the crime having occurred. *Weisser*, 2007-NMCA-015, ¶ 36. Bregar argues that in light of this authority, we should ignore the evidence that the driver's-side seat was reclined more than the passenger-side seat because emergency responders entered the car and turned the ignition off prior to Deputy Garcia's arrival. This, Bregar states in her brief in chief, shows that the picture of the seat equally supports an inference of innocence, because the seat could have been "moved after driving." But our Supreme Court has recently reiterated that the "susceptible of multiple inferences" rule is "no longer an appropriate standard for a New Mexico appellate court" to apply in reviewing the sufficiency of the evidence supporting a verdict. *State v. Garcia*, No. 35,451, 2016 WL 4487786, 2016-NMSC-___, ¶ 24, ___ P.3d ___ (Aug. 25, 2016) (emphasis omitted). Instead, our task on appeal involves first "draw[ing] every reasonable inference in favor of the jury's verdict *and then* . . . evaluat[ing] whether the evidence, so viewed, supports the verdict." *Id.* Although *Garcia* applies this rule to a sufficiency-of-the-evidence challenge, we can see no meaningful reason not to also apply the rule in the context of whether the State has shown a corpus delicti. Here, the position of the seat supports an inference that Bregar was the driver; Bregar's argument that paramedics might have moved the seat when they entered the car goes to the weight of the evidence, not its admissibility. A reasonable inference from this evidence is that Bregar was the driver. As well, we again note that the State presented evidence that the Jeep was Bregar's, that only Bregar was licensed to drive, and that Bregar was responsible for Spurlin's care. Accordingly, the State proved the corpus delicti of vehicular homicide with sufficient evidence apart from Bregar's admissions to survive Bregar's challenge on appeal.

**CONCLUSION**

**{50}** We uphold the district court's denial of Bregar's pretrial motion to suppress her hospital-bed admissions. In addition, the district court did not commit plain error by admitting Deputy Garcia's expert opinion testimony that Bregar was the driver. We reject Defendant's challenge to the sufficiency of the evidence supporting a corpus delicti. The judgment of the district court is therefore affirmed.

**{51}    IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**TIMOTHY L. GARCIA, Judge**